**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| PLEXTRONICS, INC. | ) | Case No. 14-10080 (       ) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF WILLIAM SNYDER, CHIEF FINANCIAL
OFFICER OF THE DEBTOR IN SUPPORT OF FIRST DAY MOTIONS**

I, William Snyder, hereby declare as follows:

1.      I am the Chief Financial Officer of Plextronics, Inc., debtor and debtor-in-possession (the "Debtor"), in the above captioned chapter 11 case (the "Chapter 11 Case").  I have held this position since November, 2011.  I am submitting this declaration (this "Declaration") in support of certain First Day Motions (as defined below).  All facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by others at the Debtor, my review of relevant documents or my opinion based on my experience and knowledge of the Debtor's operations, financial condition and present financial outlook.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized by the Debtor to submit this Declaration.

2.      Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the applicable First Day Motion.

<u>Introduction</u>

A.      <u>The Bankruptcy Case</u>.

3.      On January 16, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

B.      The Debtor's Business and Performance.

4.      Founded in 2002 as a spinout from Carnegie Mellon University, the Debtor is a privately held corporation organized and existing under the laws of the State of Delaware.

5.      Headquartered in Pittsburgh, Pennsylvania, the Debtor is an international leader in the research, development and commercialization of conductive and semi-conductive polymers and ink formulations, which enable the commercialization of printed electronic devices.  These patented and trade secret-protected products are sold under the Plexcore® brand.  In turn, the Debtor focuses on applying its expertise to:  (a) organic light emitting diodes ("OLED") for flat panel displays, and (b) energy storage devices such as Lithium Ion batteries.  The Debtor's market penetration strategy is to:  (y) deliver critical materials that enable OLED TV displays in larger sizes with better performance and at lower costs, and (z) penetrate large existing markets for energy storage devices where battery makers can utilize superior technology to materially improve performance and cost.

6.      The Debtor's unique "product-by-process" methodology to manufacture materials and its deep expertise in advanced materials and device technology has led to a strong intellectual property portfolio.  Indeed, the Debtor holds approximately 240 patents and pending patent applications representing approximately 50 unique families of inventions owned or controlled worldwide.

7.      As of the Petition Date, the Debtor employed approximately 34 employees.

8.      As of December 31, 2013, the Debtor's books and records reflected assets totaling approximately $3 million and total liabilities of approximately $33 million.  For the calendar year ending December 31, 2013, the Debtor generated revenues of approximately $2 million and incurred net operating losses of approximately $14 million.

C.      The Debtor's Capital and Debt Structure.

I.      Capital Structure.

9.      The Debtor is authorized to issue:  (i) 231,340,000 shares of common stock, $.00001 par value per share, and (ii) 190,100,000 shares of preferred stock, $.00001 par value per share.  The authorized preferred stock is further divided and designated as follows:  (i) 91,000,000 shares of Series B-1 Preferred Stock, (ii) 43,300,000 shares of Series B Preferred Stock, (iii) 49,600,000 shares of Series A Preferred Stock, and (iv) 6,200,000 shares of Series A-1 Preferred Stock.  The Debtor has also issued various options and warrants to buy shares of the Debtor.

II.     Prepetition Credit Facilities.

10.     Beginning in 2011 and continuing through the Petition Date, the Debtor has obtained the following secured financing:

(i)     Up to $15,475,000 from Solvay America, Inc. successor by merger to Solvay North America Investments, LLC ("Solvay"), Newlin Investment Company, L.P. ("Newlin Investment"), William R. Newlin Grantor Retained Annuity Trust Agreement I Dated 4/4/2010, Ronald O'Kelley ("O'Kelley"), and LFLP, Ltd. (collectively, the "June 2011 Noteholders"), pursuant to certain loan documents, including a Convertible Note Purchase Agreement (as amended), five (5) Convertible Promissory Notes, and a Security Agreement (the "June 2011 Credit");

(ii)    $3,000,000 from SVIC No. 20 New Technology Business Investment L.L.P. ("Samsung"), pursuant to certain loan documents, including a Convertible Note Purchase Agreement, a Convertible Promissory Note, and a Security Agreement (the "Samsung Credit");

(iii)   $4,000,000 from UDC, Inc. ("UDC"), pursuant to certain loan documents, including a Convertible Note and Warrant Purchase Agreement, a Convertible Promissory Note, and a Security Agreement (the "UDC Credit");

(iv)    Up to $5,000,000 from Solvay, pursuant to certain loan documents, including a Convertible Note Purchase Agreement, a Convertible Note and a Security Agreement (the "May 2013 Credit"); and

(v)     Up to $5,000,000 from Solvay, as collateral agent for the benefit of Solvay, Newlin Investment and O'Kelley (collectively, the "<u>Senior Noteholders</u>"), pursuant to certain loan documents, including a Convertible Note and Warrant Purchase Agreement, various Convertible Notes, and a Security Agreement (the "<u>Senior Secured Credit</u>").

11.     The lien priority of the security interests granted by the Debtor and the obligations and agreements by and among the June 2011 Noteholders, Samsung, UDC, Solvay (collectively, the "<u>Junior Noteholders</u>", and collectively with the Senior Secured Noteholders, the "<u>Investors</u>") and the Senior Noteholders related to their respective convertible credits are set forth and described in that certain Third Amended and Restated Intercreditor Agreement dated September 20, 2013 (the "<u>Intercreditor Agreement</u>").  In short, although the Senior Secured Credit was issued last in time, the Intercreditor Agreement provides that the Senior Secured Credit is secured by a first priority and senior lien on substantially all of the Debtor's assets and the June 2011 Credit, Samsung Credit, UDC Credit and May 2013 Credit (collectively, the "<u>Junior Secured Credits</u>", and collectively with the Senior Secured Credit, the "<u>Secured Credits</u>") are secured by a subordinated lien on substantially all of the Debtor's assets.

12.     No principal or interest has ever been paid to the Senior Noteholders in connection with the Senior Secured Credit or the Junior Noteholders in connection with the Junior Secured Credits.  As of December 31, 2013, the approximate amounts of principal and interest outstanding on the Secured Credits are as follows:

| <u>**Credit Facility**</u> | <u>**Approximate Amount Outstanding**</u> |
|---|---|
| Senior Secured Credit | $2,420,309 |
| June 2011 Credit | $17,187,927 |
| Samsung Credit | $3,155,750 |
| UDC Credit | $4,178,667 |

| May 2013 Credit | $2,622,778 |
|---|---|

D.     Events Leading to the Filing of the Chapter 11 Case.

13.     As described above, the Debtor is a high technology research and development company that, by its very nature, has experienced operational losses since its inception.   Indeed, in the years leading up to 2011, while the Debtor generated relatively modest revenue and received governmental grants, such funds were insufficient to cover all of the expenses and such excess expenses were funded by equity infusions from shareholders.  Since 2011, the operational losses have been primarily funded by draws from the Secured Credits.

14.     In June 2010, the Debtor engaged Cowen and Company, LLC ("Cowen") as an advisor to provide the Debtor assistance and advice related to potential strategic alternatives, (including evaluating additional private capital raises, public markets and/or M&A opportunities), analyze the Debtor's business and operations, and providing such other financial advisory and investment banking services as the parties may agree.

15.     In or about fall 2010, the Debtor commenced negotiations with Solvay related to Solvay's potential acquisition of the Debtor through a staged stock acquisition.  In turn, in October 2010, the Debtor and Cowen supplemented and amended their June 2010 engagement letter to provide that Cowen will act as the exclusive financial advisor to the Debtor in connection with the proposed Solvay staged stock acquisition.  Unfortunately, in or about late fall 2010, Solvay informed the Debtor that the proposed acquisition was not approved by Solvay's board of directors and the acquisition was abandoned.  Nevertheless, the Debtor and Cowen continued their efforts to find a recapitalization source for the Debtor.

16.     In this regard, in August 2011, the Debtor and Cowen amended and restated their existing engagement to provide, *inter alia*, for Cowen to serve as the exclusive placement agent for the Debtor.  At that time, the goal was for Cowen to market the Debtor and identify an "accredited investor" to purchase and acquire the Debtor's securities.

17.     Meanwhile, in or about June 2011, Solvay completed a stock acquisition from certain third party shareholders whereafter Solvay acquired approximately 19% of the Debtor's outstanding voting capital stock from existing shareholders.  Upon consummating this transaction, Solvay held (and holds as of the Petition Date) approximately 47% of the Debtor's outstanding voting capital stock.  In connection with Solvay's acquisition, the June 2011 Noteholders provided the June 2011 Credit which, like the equity infusions that came before, was used to supplement the Debtor's operational expenses.

18.     Additionally, in April 2012, Samsung became an investor in the Debtor via the Samsung Credit and such funds were used to fund the Debtor's operational expenses.

19.     In July 2012, UDC and the Debtor negotiated the terms of a strategic alliance.  Such alliance called for UDC to provide the UDC Credit and the parties also executed a Joint Development Agreement (the "JDA") whereby UDC and the Debtor intended to accelerate development, evaluation, and commercialization of certain products and UDC would, *inter alia*, provide the Debtor quarterly installments of $250,000, to assist in the joint development program.  Again, the funds from UDC were used to fund the Debtor's ongoing operations.  On December 20, 2013, UDC provided written notice of its intent to terminate the JDA effective December 23, 2013.

20.     During the fourth quarter of 2012, the Debtor along with Cowen actively marketed the Debtor for a Series C capital raise.  In connection with this private placement, Cowen distributed

a business overview to approximately 100 potential parties.  In turn, Cowen conducted approximately 50 meetings/calls with potential financial/strategic/international investors.

21.     In or about early 2013, the Debtor (with Cowen's assistance) began negotiating with a potential investor whose investment would provide a short and long term solution for the Debtor's operational needs.  To provide the Debtor the opportunity and time to develop this potential transaction, Solvay obtained approval from its management to provide the May 2013 Credit. Negotiations with the potential investor continued until April 2013, when the potential investor decided to disengage from discussions and pass on the opportunity shortly after such approval had been obtained from Solvay's management.  After these discussions ended, Solvay nonetheless elected to proceed with providing the May 2013 Credit and the Debtor used the proceeds from the May 2013 Credit to fund continue operations while it considered alternative opportunities.

22.     By early summer 2013, it became apparent to the Debtor that it was not going to be able to raise additional investor funds within the milestones contained in the May 2013 Credit documents.  As such, in or about July 2013, the Debtor decided that the best way to maximize value would be to market and sell its business and assets as a going concern.  To provide the Debtor funding during this marketing and sale process, the Debtor and Solvay negotiated the terms and conditions of the Senior Secured Credit which would fund the Debtor's operations through a sale process.  During the negotiations, the Debtor and Solvay recognized that a Chapter 11 bankruptcy filing might be necessary to consummate any sale transaction, and therefore, the loan documents evidencing Senior Secured Credit provided a commitment for certain debtor-in-possession financing.

23.     At the same time, the Debtor instructed Cowen to identify potential acquirers for the company or substantially all of the Debtor's assets.  Due to liquidity constraints, the marketing period for this process commenced immediately and concluded in December, 2013.  Utilizing the list of

parties who expressed an interest during the Series C private placement, Cowen along with the Debtor contacted approximately 20 parties in connection with the proposed sale of the Debtor's assets.

24.     Of the parties contacted by Cowen and the Debtor during the sale process, approximately 10 parties requested further meetings with the Debtor's management team.  Following these initial informational sessions, certain parties requested additional information from the Debtor and engaged in various individualized diligence sessions.

25.     The Debtor and Cowen were unable to identify a buyer ready and able to close within the sale and marketing timeframe of approximately July 2013 through December 2013.  Upon determining that the sale process would not produce a timely sale and it became clear the Debtor would not be able to meet the conditions for future funding under the Senior Secured Credit documents, the Debtor and Solvay commenced negotiations for the potential sale and purchase of the Debtor's assets.  These negotiations resulted in a written term sheet detailing the general terms surrounding Solvay's acquisition of the Debtor's assets.

26.     Given the Debtor's deteriorating cash situation and its significant financial losses arising from its operations, coupled with its inability to find any parties willing to provide additional capital requirements, the Debtor and its advisors determined that an out-of-court restructuring was not achievable.  Based upon the determination that the proposed sale could only be consummated in the context of this bankruptcy proceeding, the Debtor and Solvay negotiated the APA (as defined below), which provides that Solvay will serve as a stalking horse bidder to facilitate a sale pursuant to Bankruptcy Code section 363.  The Debtor believes that other potential buyers may be willing to participate in the 363 sale process.

E.      Objectives of the Chapter 11 Filing.

27.      In spite of its ongoing operational losses, the Debtor has significant valuable assets and going concern value.  After considering other alternatives and in an effort to maximize the value of the Debtor's assets and maintain jobs for employees, the Debtor has engaged in negotiations with Solvay for the sale and purchase of the Debtor's assets.  In connection with these negotiations, the Debtor and Solvay determined that any such sale should occur inside a Chapter 11 case so that the sale could be subject to higher and better offers and would provide the most flexibility to other potential bidders.  The Debtor and Solvay have executed an Asset Purchase Agreement (the "APA") for the sale of substantially all of the Debtor's assets.

28.      The Debtor was also able to negotiate the use of the Investors' cash collateral and the entry of a debtor in possession financing credit agreement (the "DIP Facility") with Solvay.  The Debtor believes that the use of the Investors' cash collateral and the DIP Facility provide the Debtor with sufficient liquidity to complete a bankruptcy court supervised sale process that will enable the Debtor to maximize the value of its estate.

29.      To this end, the Debtor filed a motion seeking approval of a sale process, including bid procedures, pursuant to which the Debtor will use Solvay as the stalking horse and the APA as the stalking horse bid.  Notwithstanding and as expressly contemplated by Solvay's bid (subject to an approximate 21 day blackout period whereby no marketing can be performed), the Debtor will aggressively market its assets as a going concern in an effort to locate as many other potential bidders as possible and solicit higher and better offers.  Accordingly, after considering other alternatives, the Debtor concluded that the most effective way to maximize the value of its estate for the benefit of creditors and preserve as many jobs as possible is by commencing this Chapter 11 Case to complete

a prompt sale of substantially all of its assets pursuant to section 363 of the Bankruptcy Code, subject to higher and better bids at a public auction.

F.      <u>First Day Motions and Orders</u>.

30.     In furtherance of these objectives, the Debtor intends to file a number of first day motions (the "First Day Motions") and proposed orders and respectfully requests that the Court consider entering the proposed orders granting the relief sought in the First Day Motions.  I have reviewed each of the First Day Motions and Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to its business or loss of productivity or value, and (b) constitutes a critical element in achieving the Debtor's successful reorganization.

      I.      Operational Motions.

            ii.     *Cash Management Motion*

            A.      The Debtor Should Be Granted Authority to Maintain Its Existing Bank Accounts.

31.     Before the Petition Date, the Debtor, in the ordinary course of business, maintained five (5) bank accounts with Square One Bank (collectively, the "Bank Accounts"), and described as follows:

| Account Number | Type of Account | Purpose of Account |
|---|---|---|
| xxx677 | Checking | Operating |
| xxx861 | Money Market | Credit Card Deposit |
| xxx983 | Checking | Flexible Spending Account |

| | | (Escrow for Employees) |
|---|---|---|
| xxx248 | Money Market | Investment |
| xxx242 | Checking | Plex Korea |

32.     The Debtor seeks a waiver of the United States Trustee's requirement that the Bank Accounts be closed and that new postpetition bank accounts be opened at depositories authorized by the United States Trustee.  If enforced in this Chapter 11 Case, this requirement would cause enormous disruption in the Debtor's business and would impair its efforts to reorganize.

33.     Maintaining the Bank Accounts would greatly facilitate the Debtor's "seamless transition" to postpetition operations.  To avoid delays in paying debts incurred postpetition and to ensure as smooth a transition into chapter 11 as possible, the Debtor should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.  Otherwise, transferring the Bank Accounts will be tremendously disruptive and time consuming.  Indeed, the Debtor's customers and other third parties routinely remit payments to the Debtor via wire transfers.  By permitting the Debtor to maintain the Bank Accounts, the Court will enable the Debtor to avoid confusion associated with providing its customers and other third parties new wire information and the possibility that such party will attempt to wire funds into a closed bank account.

34.     The Debtor also seeks a waiver of the requirement that it establish specific bank accounts for tax payments.  I believe that tax obligations can be paid most efficiently out of the existing Bank Accounts (namely the Operating Account), that the United States Trustee can adequately monitor the flow of funds into, among and out of the Bank Accounts, and that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessary and inefficient.

        B.      The Debtor Should Be Granted Authority to Use Existing Business Forms and Checks.

35.      To minimize expense to the Debtor's estate, I believe that the Debtor should be authorized to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well as checks existing immediately before the Petition Date, without reference to its status as debtor in possession.  Once the Debtor runs out of  preprinted checks that do not bear that designation, the Debtor will add such designation to any new checks its obtains or creates post-petition.

36.      Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor-in-possession.  Changing correspondence and business forms is therefore unnecessary, and would burden the estate by the expense involved and also would disrupt the Debtor's business operations.

        C.      Continuing the Debtor's Existing Cash Management System.

37.      The Debtor's cash management system is relatively simple and straight forward. Substantially all – if not all – of the Debtor's receipts and disbursements are made from the Operating Account.  The Credit Card Deposit Account is a collateral account for the benefit of the Debtor's credit card company to backstop any charges.  The Flexible Spending Account is an account funded by the Debtor's employees whereby an employee's qualified medical purchases are paid.  Lastly, the Investment and Plex Korea Accounts are inactive accounts and contain no or virtually no funds.

38.      With respect to employee payroll, the Operating Account is used to fund the payment of payroll and related taxes.  The employees of the Debtor are generally paid their compensation by the Debtor's third-party payroll service, ADP.  Direct deposits and tax payments are all processed by ADP.  ADP deducts the direct deposit amount from the Operating Account and transfers the money

to each employees' bank account.   These transfers are made by ADP, at the direction of the Debtor

and in accordance with the payroll information transmitted to ADP.

> D.      Need to Continue Cash Management System.

39.      The Debtor seeks authority to continue utilizing its current cash management system,

as described above.  Substantially disrupting this cash management procedure would severely impair

the Debtor's ability to preserve and enhance its respective going concern values and to successfully

reorganize during this Chapter 11 Case.   Moreover, opening new accounts and establishing a new

cash management system would also inevitably have a deleterious effect on the Debtor's record

keeping – which would subvert the goal of the U.S. Trustees guidelines.  It is essential, therefore, that

the Debtor be permitted to continue to use its current Bank Accounts and current cash management

system.

40.      The Debtor has utilized its cash management system as described herein in its current

basic structure for more than five years as a mainstay of its ordinary, usual and essential business

practices.

41.      The widespread use of this type of cash management system, moreover, is

attributable to the numerous benefits it provides, including the ability to (a) control and monitor

corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating

the movement of funds and the development of timely and accurate balance and presentment

information.  In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary

distractions that would inevitably be associated with a substantial disruption of the cash management

system, will facilitate and enhance the Debtor's reorganization efforts to maximize its assets for the

benefit of its stakeholders.  For similar reasons, the Debtor should be authorized to continue to fund

its business and operations by payments made from the Operating Account.

          ii.     *Utility Motion*.

42.     In connection with its business operations, the Debtor obtains telephone and telecommunication services from three (3) utility companies and other providers (each a "<u>Utility Provider</u>" and, collectively, the "<u>Utility Providers</u>").  A list of the names and addresses and average monthly bill is attached as an exhibit to the proposed Interim Order for this First Day Motion.  The Debtor generally pays each of the Utility Providers following receipt of a monthly invoice, for services provided during the immediately preceding month.

43.     If utility services to the Debtor's facility were interrupted, the Debtor would no longer be able to operate its business, and could suffer irreparable harm.  Such an interruption would undoubtedly impede the Debtor's efforts to maximize the value of its business.

44.     In order to provide adequate assurance of payment for future services to their Utility Providers, the Debtor proposes to maintain deposit equal to 50% of the Debtor's average monthly utility charges over the preceding twelve (12) months, for each Utility Provider at each location, which amount totals approximately $1,495.86 in the aggregate.  The Debtor proposes that the deposit should be held by the Debtor in its Investment Account for the benefit of the Utility Providers.  The amount proposed to be held on behalf of each Utility Provider is attached as an exhibit to the proposed Interim Order for this First Day Motion.

45.     Notwithstanding the foregoing, the Debtor reserves the right to not pay the proposed deposit and permit the Utility Provider to shut off service at its location.

46.     This First Day Motion also seeks to establish reasonable procedures by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its utility deposit does not provide it with satisfactory adequate assurances.

iii.     *Employee Motion*.

47.     Prior to the Petition Date and in the ordinary course of its business, the Debtor provided its employees (the "Employees") with wages, salaries, vacation time, sick leave, 401(k) plan and other compensation.  The Debtor seeks authority to pay the accrued but unpaid pre-petition compensation owed to its Employees (along with payroll taxes and other related amounts) in accordance with the Debtor's ordinary business practices.  The Employees are essential to the orderly operation and survival of the Debtor's business.  Consequently, it is critical that the Debtor continues to honor its prepetition obligations to the Employees.

48.     If the Employee obligations are not honored and timely paid, the Employees may suffer personal hardship and be unable to pay their daily living expenses, and may be required to bear personally expenses that were incurred on behalf of the Debtor with the expectation that they would be reimbursed.  There would undoubtedly be a marked deterioration in morale among employees at a critical time, and an attendant negative impact on the Debtor and its operations which could only diminish the value of the Debtor's assets and its ability to achieve its objectives in Chapter 11.

49.     The Debtor employs approximately 34 Employees.  The Employees are paid bi-monthly, on the fifteenth and the last day of the month.

50.     Distribution of the payroll is generally handled by ADP with the support of the Debtor.  ADP has access to the Debtor's Operating Accounts whereby ADP transfers from the Debtor's Operating Account, an amount sufficient to cover the then current payroll.  ADP similarly directly debits the Debtor's Operating Account for the employee and employer taxes and other deductions and remits such payments to the appropriate third party on the Debtor's and employees' behalf.

51.     The Debtor paid the Employees in the ordinary course on January 15, 2014, for work that was performed through January 15, 2014.

52.     The Debtor filed its bankruptcy case the day after the last pay period so arguably there are no prepetition wages due and owing to the Employees.  That said, the Debtor seeks to ensure that it can pay the Employees for less than one (1) day of pre-petition work for which payment has not yet been made and remit the related taxes and payroll deductions to the appropriate third parties ("Withholding Obligations"), not to exceed the Bankruptcy Code maximum amount.

A.   Vacation Obligations.

53.     Under the Debtor's vacation policy, the Employees earn vacation days (accrued on a monthly basis), depending on the Employee's position and number of years of service. Vacation time must be used in the calendar year and the Debtor does not compensate any Employee for accrued but unused vacation time.

54.     The Debtor does not seek to pay accrued vacation pay in a lump sum, but rather to continue to allow each affected Employee to use or take accrued vacation or pay for unused vacation time consistent with pre-petition practice.

B.   Sick Leave Obligations.

55.     The Debtor provides its Employees with 5 sick leave days per year.  Sick time must be used in the calendar year and the Debtor does not compensate any Employee for accrued but unused sick time.  Similar to vacation pay, the Debtor does not seek to pay accrued sick pay in a lump sum, but rather to continue to allow each affected Employee to use or take accrued sick pay consistent with pre-petition practices.

C.   Reimbursable Business Expenses.

56.      Prior to the Petition Date and in the ordinary course of its business, the Debtor

reimbursed Employees for actual, reasonable, and proper business and/or travel expenditures

incurred in the normal course of their employment (collectively, the "Reimbursable Expenses").

Although the Debtor encouraged the submission of reimbursement requests by Employees so

that outstanding Reimbursable Expenses could be reimbursed prior to the Petition Date, it is likely

that not all such requests were submitted or paid pre-petition.  The Debtor does not at this time

know the precise amount of such incurred but unreimbursed Reimbursable Expenses, but the

Debtors estimate that the amount is less than $3,000.

D.   401(k) Plan.

57.      The Debtor provides an opportunity for eligible employees to participate in a 401(k)

plan.  Employees may make elective deferrals up to the maximum allowable by law by way of

payroll deductions.  The Debtor has the discretion whether to match the Employees

contributions, but the Debtor hasn't exercised such discretion since 2011.

E.   Employee Benefits.

58.      In the ordinary course of its business, the Debtor maintains an employee benefits

program that provides the Employees with medical/health insurance benefits, dental, vision, short

and long term disability, Flexible Spending Account, group life insurance and various other benefits

(collectively, the "Employee Benefits").  These benefits are provided pursuant to pre-petition

contracts between the Debtor and insurance company/benefit providers.  The Debtor intends to

satisfy its post-petition obligations for benefits received under the pre-petition contract in the

ordinary course of business.

iv.    *DIP Facility and Cash Collateral Motion*

59.    Finally, as discussed above, the Debtor has also sought authority to: (a) enter into and borrow under the debtor in possession facility being offered by Solvay, and (b) use Cash Collateral of the Investors.  For the reasons set forth below, the Court's approval of this motion is absolutely critical.

60.    The Debtor believes that the best means to maximize the value of the Debtor's assets is to promptly conduct an auction sale.  The Debtor, however, lacks sufficient funds to operate its business and meet its post-petition obligations pending a sale of its assets before this Court.  Prior to the Petition Date and in connection with the negotiation of the Senior Secured Credit, the Debtor requested that Solvay provide post-petition financing to enable the Debtor to continue to operate in the ordinary course through the closing of an auction sale.  Following arms-length negotiations and as expressly provided in the Intercreditor Agreement, the Secured Creditors agreed to permit the Debtor to use their cash collateral and Solvay is providing post-petition financing, to enable the Debtor to operate through the closing of an auction sale.

61.    The Debtor has virtually no unencumbered funds or credit available to fund its business operations.  Without funding under the debtor-in-possession financing facility from Solvay and the use of cash collateral, as proposed herein, the Debtor's operations will have to immediately cease, the value of its assets will be severely diminished, and many jobs will be lost.  Further, due to severe operating and financial difficulties, the Debtor has been unsuccessful in its attempts to secure funding outside of a chapter 11 context nor could the Debtor secure funding inside of a chapter 11 bankruptcy on an unsecured or subordinated basis.  In short, without the use of cash collateral and funding under the proposed debtor-in-possession financing facility, the Debtor's prospects for a successful reorganization will be substantially undermined and the value of the Debtor's assets will

be placed in serious jeopardy.  Therefore, it is imperative that the Debtor be authorized to use cash collateral and obtain debtor-in-possession financing in order to preserve its assets pending the conduct of an action sale before this Court.

62.     To protect and preserve the Debtor's assets pending conclusion of a sale process, Solvay agreed to waive any defaults existing under the Senior Secured Credit and proceed  with its commitment to honor the DIP Facility.  Under the DIP Facility, the Debtor has the ability to obtain advances in an amount not to exceed $1,660,000, which includes up to $642,319 on an interim basis. As discussed herein, the DIP Facility further contemplates the use of cash collateral in accordance with the terms, conditions and limitations set forth in the Budget.  The DIP Facility contemplates that the Debtor will first use available cash collateral to satisfy obligations, and then use proceeds from the DIP Facility.

63.     The Debtor believes that advances under the DIP Facility coupled with use of cash collateral will be sufficient to enable the Debtor to continue to operate on a going concern basis for approximately sixty (60) days after the Petition Date, an amount of time sufficient to allow them to complete an orderly sale process, plus another approximate thirty (30) days to conduct a post-sale wind-down.  The terms and conditions of the DIP Facility, including the protections and rights granted to Solvay, are set forth in their entirety in the Senior Secured Credit Agreement itself, which is annexed to this First Day Motion as an exhibit.

64.     The DIP Facility was negotiated at arms' length and in good faith, and its terms and conditions are reasonable under the circumstances.

65.     Based on the above, the Debtor decided, in the exercise of its sound business judgment, that the DIP Facility (together with the use of cash collateral) was the most favorable under the circumstances and addressed the Debtor's working capital needs.  It, along with the use of

cash collateral, will afford the Debtor valuable additional time to pursue the sale process while maintaining the going concern value of the Debtor's business.  Thus, I respectfully request the Court to authorize the Debtor to immediately borrow funds under the DIP Facility.

66.    In addition, the Investors have agreed, pursuant to the terms of the Intercreditor Agreement, to allow the Debtor to use cash collateral upon the conditions set forth in this First Day Motion and in the proposed Interim Order and Final Order.  The Debtor requires immediate access to funds in order to pay essential expense items.  The Debtor also requires certain funds to pay any unforeseen costs and expenses pending a final hearing on this First Day Motion.  Consequently, the Debtor seeks emergency and interim relief as soon as possible.

<THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK>

G.      Conclusion.

In order to minimize any loss of value to the Debtor's business, the Debtor's immediate objective is to engage in business as usual following the commencement of this Chapter 11 Case, with as little interruption to its operations as possible.  I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of creditors of the Debtor's estates, will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  January 17, 2014
        Pittsburgh, Pennsylvania

By:      William Snyder
Title:   Chief Financial Officer of the Debtor