# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PLEXTRONICS, INC., | ) | Case No. 14-10080 (    ) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) AUTHORIZING AND APPROVING REIMBURSEMENT OF THE STALKING HORSE PURCHASER'S EXPENSES, (C) AUTHORIZING AND APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, (D) SCHEDULING AUCTION AND SALE APPROVAL HEARING, (E) APPROVING THE FORM AND MANNER OF THE NOTICE OF THE SALE HEARING, AND (F) GRANTING CERTAIN RELATED RELIEF, AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, AND (C) GRANTING CERTAIN RELATED RELIEF

Plextronics, Inc., the debtor and debtor-in-possession ("Plextronics" or the "Debtor"), by and through its undersigned counsel, hereby moves the Court pursuant to sections 105(a), 363, 365, and 503 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order establishing sale and bidding procedures (the "Bidding Procedures") substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order") and following a sale hearing to be conducted at a date to be set by the Court, entry of a sale order substantially in the form attached hereto as Exhibit B (the "Sale Order") granting the relief requested below. In

support of this motion (the "Motion"), the Debtor relies upon the Declaration of William Snyder, Chief Financial Officer of the Debtor in Support of First Day Motions (the "First Day Declaration"). In further support of this Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtor requests the entry of: (i) the Bidding Procedures Order granting approval for the process by which the Debtor will conduct an auction (the "Auction") for the sale of substantially all of the Debtor's assets (the "Purchased Assets", as further detailed and described in the proposed Stalking Horse APA dated January 16, 2014 (the "Stalking Horse APA"), a copy of which is attached to the Sale Order); and (ii) the Sale Order authorizing the Sale of the Purchased Assets to the successful bidder.

2.      Prior to the Petition Date, after significant efforts (which efforts commenced in 2010) by the Debtor and Cowen and Company, LLC ("Cowen") to identify an accredited investor to purchase and acquire the Debtor's securities, the Debtor determined that the best way to maximize value for its stakeholders would be to market its assets for sale as a going concern. Towards that end, commencing in or about July 2013 and continuing until December 2013, the Debtor and Cowen conducted a marketing process for the sale of substantially all of the Debtor's assets. The Debtor and Cowen were unable to identify a buyer ready and able to close within said sale and marketing timeframe. Upon determining that the sale process would not produce a timely sale and it became clear the Debtor would not be able to meet the conditions for future funding under its senior secured credit documents, the Debtor and Solvay America, Inc. ("Solvay"), its primary secured lender and shareholder,[1] commenced negotiations for the potential sale and purchase of the Debtor's assets. These good faith arms length negotiations

---

[1]      As of the Petition Date, Solvay owned approximately 47% of the outstanding voting capital stock of the Debtor. Thus, Solvay likely falls within the definition of "insider" as defined in section 101(31) of the Bankruptcy Code.

resulted in a written term sheet and ultimately culminated in the execution of the Stalking Horse APA.

3.        While successful in negotiating the Stalking Horse APA, the Debtor's financial projections show that it will not have adequate liquidity to continue to fund its business operations and would be forced to cease all business operations absent the immediate infusion of cash sufficient to bridge its liquidity needs until the closing of any such sale.  Against this backdrop, Solvay (in its capacity as the lender of the debtor-in-possession financing discussed herein, the "DIP Lender") has agreed to provide the Debtor with certain debtor-in-possession financing (the "DIP Facility") to facilitate the Debtor's sale of its business and assets, as a going concern, in the context of this chapter 11 case.  Moreover, due to the significant cash demands pending the closing of the sale, and the parties' respective interests in minimizing any incremental financing to the amount necessary to close the sale of the Purchased Assets in a commercially reasonable timeframe, and given the prior marketing that proved unsuccessful despite the best efforts of all parties involved, the terms of the Stalking Horse APA and the related debtor-in-possession credit facility that the DIP Lender is willing to provide establish milestones for completion of the auction process.

4.        In particular, to maximize value of its estate for the benefit of all interested parties, the Debtor is seeking to conduct the Auction pursuant to the Bidding Procedures, to be approved by the Bidding Procedures Order entered no later than February 7, 2014.

5.        The Bidding Procedures contemplate that prospective purchasers must submit all-cash bids by Friday, February 28, 2014 and that, if more than one "Qualified Bid" is received, an Auction will be conducted on Wednesday, March 5, 2014.  The bid already submitted by Solvay under the Stalking Horse APA (the "Stalking Horse Bid") is deemed to constitute a Qualified

Bid for purposes of the Bidding Procedures. Among other requirements, bidders will be required to submit bids marked to show any variations from the Stalking Horse Bid. Upon the selection of a winning bid, the Debtor will seek approval for the sale of the Purchased Assets to the successful bidder pursuant to the executed form of the Stalking Horse APA (or other applicable purchase agreement) at a sale hearing (the "Sale Hearing") to be conducted not later than March 7, 2014.

6.      This Motion is based on the facts and authority set forth below, the First Day Declaration, the record in this case, and the arguments, evidence and representations that may be presented at or prior to the hearing on this Motion.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtor's chapter 11 case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution. The legal authority for the relief requested herein is sections 105(a), 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1.

## PROCEDURAL STATUS

8.      On January 16, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee has been established in this chapter 11 case.

9.      Additional information about the Debtor's business, its capital and debt structure, and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

## FACTUAL BACKGROUND

### The Debtor's Marketing Efforts Leading to the Stalking Horse APA

10.      As detailed in the First Day Declaration, the Debtor's chapter 11 filing is the result of an existential liquidity crisis.

11.      Indeed, in the years leading up to 2011, while the Debtor generated relatively modest revenue and received governmental grants, such funds were insufficient to cover all of the expenses and such excess expenses were funded by equity infusions from shareholders. Since 2011, the operational losses have been primarily funded by draws from certain Convertible Note and Warrant Purchase Agreements (as more particularly described in the First Day Declaration).

12.      In June 2010, the Debtor engaged Cowen and Company, LLC ("Cowen") as an advisor to provide the Debtor assistance and advice related to potential strategic alternatives, (including evaluating additional private capital raises, public markets and/or M&A opportunities), analyze the Debtor's business and operations, and providing such other financial advisory and investment banking services as the parties may agree.

13.      In or about fall 2010, the Debtor commenced negotiations with Solvay related to Solvay's potential acquisition of the Debtor through a staged stock acquisition. Unfortunately, in or about late fall 2010, Solvay informed the Debtor that the proposed acquisition was not approved by Solvay's board of directors and the acquisition was abandoned. Nevertheless, the Debtor and Cowen continued their efforts to find a recapitalization source for the Debtor.

14.    In this regard, in August 2011, the Debtor and Cowen amended and restated their existing engagement to provide, *inter alia*, for Cowen to serve as the exclusive placement agent for the Debtor.  At that time, the goal was for Cowen to market the Debtor and identify an "accredited investor" to purchase and acquire the Debtor's securities.

15.    During the fourth quarter of 2012, the Debtor along with Cowen actively marketed the Debtor for a Series C capital raise.  In connection with this private placement, Cowen distributed a business overview to approximately 100 potential parties.  In turn, Cowen conducted approximately 50 meetings/calls with potential financial/strategic/international investors.

16.    In or about early 2013, the Debtor (with Cowen's assistance) began negotiating with a potential investor whose investment would provide a short and long term solution for the Debtor's operational needs.  Negotiations with the potential investor continued until April 2013, when the potential investor decided to disengage from discussions and pass on the opportunity.

17.    By early summer 2013, it became apparent to the Debtor that it was not going to be able to raise additional investor funds within the milestones contained in the May 2013 Credit documents.  As such, in or about July 2013, the Debtor decided that the best way to maximize value would be to market and sell its business and assets as a going concern.

18.    Based upon this decision, the Debtor instructed Cowen to identify potential acquirers for the company or substantially all of the Debtor's assets.  Due to liquidity constraints, the marketing period for this process commenced immediately and concluded in December, 2013.  Utilizing the list of parties who expressed an interest during the Series C private placement, Cowen along with the Debtor contacted approximately 20 parties in connection with the proposed sale of the Debtor's assets.

19.     Of the parties contacted by Cowen and the Debtor during the sale process, approximately 10 parties requested further meetings with the Debtor's management team. Following these initial informational sessions, certain parties requested additional information from the Debtor and engaged in various individualized diligence sessions.

20.     The Debtor and Cowen were unable to identify a buyer ready and able to close within the sale and marketing timeframe of approximately July 2013 through December 2013. Upon determining that the sale process would not produce a timely sale and it became clear the Debtor would not be able to meet the conditions for future funding under the Senior Secured Credit documents, the Debtor and Solvay commenced negotiations for the potential sale and purchase of the Debtor's assets. These negotiations resulted in a written term sheet detailing the general terms surrounding Solvay's acquisition of the Debtor's assets.

21.     Given the Debtor's deteriorating cash situation and its significant financial losses arising from its operations, coupled with its inability to find any parties willing to provide additional capital requirements, the Debtor and its advisors determined that an out-of-court restructuring was not achievable. Based upon the determination that the proposed sale could only be consummated in the context of this bankruptcy proceeding, the Debtor and Solvay negotiated the Stalking Horse APA (as defined below), which provides that Solvay will serve as a stalking horse bidder to facilitate a sale pursuant to Bankruptcy Code section 363. The Debtor believes that other potential buyers may be willing to participate in the 363 sale process.

**<u>Terms of the Proposed Sale</u>**

22.     Pursuant to Rule 6004-1 of the Local Rules, the following summary highlights the material terms of the Stalking Horse APA and Sale Order and all parties in interest are referred to the text of the attached Stalking Horse APA and Sale Order for additional information:[2]

    i.    ***Proposed Purchaser***:  Solvay.  Because the Buyer holds approximately 47% of the Debtor's voting capital stock, the Buyer is likely an insider of the Debtor.  The Stalking Horse APA and the sale process itself is fair because (i) the Buyer no longer holds has any positions on the Debtor's Board of Directors, (ii) an investment banker was engaged to market the company and its assets, and (iii) the Debtor had independent legal counsel negotiating the Stalking Horse APA.

    ii.    ***Seller***:  The Debtor.

    iii.    ***Purchase Price***:  As set forth in Section 3.1 of the Stalking Horse APA, the Purchase Price is $32,612,276.  On the Closing Date, the Buyer shall pay or cause to be paid to the Seller $24,089,304 of the Purchase Price in the form of a credit bid of its present and anticipated senior secured debt against the Seller, including under the Buyer DIP Facility ("Purchase Price Credit Bid Component") and the balance of $8,522,972 in cash (the "Purchase Price Cash Component", and together with the Purchase Price Credit Bid Component, the "Closing Payment").  The Buyer shall pay or cause to be paid to the Seller the Purchase Price Cash Component by wire transfer of immediately available funds to an account designated by the Seller on or prior to the Closing Date. The exercise of the Purchase Price Credit Bid Component will become final automatically upon delivery of the Purchase Price Cash Component to the Seller. On the Closing Date, and only in the event that the Purchase Price remains $32,612,276 and is not increased by the virtue of an Auction, Buyer shall also pay or cause to be paid to Seller's bankruptcy estate an amount in cash equal to the allowed fee payable to Seller's investment banker in connection with this transaction in an aggregate amount not to exceed $407,653, plus the reasonable and actual out-of-pocket expenses of the Seller's investment banker in connection with this transaction not to exceed, absent unexpected travel requirements or other exigent circumstances, $15,000 in the aggregate, which thereafter shall be then payable by Seller to such investment banking firm pursuant to the "Carve Out" set forth in the Final DIP Order and which obligation shall be a cash obligation in addition to the stated amount of the Purchase Price Cash Component.

---

[2]     This summary is qualified in its entirety by reference to the Stalking Horse APA and Sale Order, and the Stalking Horse APA and Sale Order shall control to the extent of any conflict.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to them in the Stalking Horse APA.

iv.    ***Agreements with Management:*** As set forth in Section 7.7(e) of the Stalking Horse APA, the Buyer and certain of the Debtor's senior management have negotiated the terms of a consulting agreement regarding post-closing services. A copy of the offer letter and the consulting agreement is attached to the Stalking Horse APA as <u>Exhibits G</u> and <u>H</u> respectfully. In general, in exchange for providing an average of 16 hours of service to the Buyer per week for the first six months after closing, the consultant will receive a monthly payment equal to his current monthly Base Pay with the Debtor.

v.    ***Releases:*** As set forth in Section 7.18 of the Stalking Horse APA, the Seller agrees not pursue any Avoidance Actions against any current or former employee, supplier, vendor or landlord of the Seller or the Business who is a party to a Contract or a Real Property Lease that is, or is intended to be, an Assumed Agreement or Assumed Real Property Lease, and the Seller releases, subject to the occurrence of and effective as of the Closing, any rights it may have with respect to any such Avoidance Actions

vi.    ***Private Sale/No Competitive Bidding:*** As described in this Motion, the sale contemplated by the Stalking Horse APA contemplates competitive bidding via an auction process. As set forth in Section 7.23 of the Stalking Horse APA, from the date of the Stalking Horse APA until the Bidding Procedures Order, the Seller shall not, and shall cause its Representatives and Affiliates not to, directly or indirectly, (a) initiate contact with, pursue, facilitate, solicit or encourage submission of, or discuss, negotiate or assist with, any inquiries, proposals or offers by any Person (other than the Buyer and its Affiliates and Representatives) with respect to a Competing Bid or (b) provide any Person (other than the Buyer and its Affiliates, agents and Representatives) with access to the books, records, operating data, contracts, documents or other information in connection with any Competing Bid. The Seller shall, and shall cause its Affiliates and Representatives to, (i) immediately cease and cause to be terminated any and all contacts, discussions and negotiations with any Person other than the Buyer and its Affiliates and Representatives regarding the foregoing, in each case until the date the Bankruptcy Court enters the Bidding Procedures Order; (ii) promptly notify Buyer if any Competing Bid as submitted to the Seller, and the details of such Competing Bid (including the identity of the third party or third parties and copies of any Competing Bid); and (iii) keep the Buyer fully informed with respect to the status of the foregoing. The Seller shall not, without the prior consent of the Buyer, release any Person from, or waive any provision of, any standstill agreement or confidentiality agreement to which the Seller is a party. Notwithstanding anything to the contrary, the Seller may continue to have day-to-day business discussions with its customers (or prospective customers) and vendors (or prospective vendors) where public information may be disclosed and may respond to general inquiries and disclose public

information related to the Seller, the transactions contemplated in this Agreement, the Bankruptcy Case, and other information required by the Bankruptcy Code and/or Bankruptcy Rules to creditors, vendors, customers, employees, parties-in-interest and prospective purchasers solely in the manner of referring any such inquiring Person to the appropriate link on Seller's website and/or to the Seller's lead bankruptcy counsel.

vii.    ***Closing and Other Deadlines:***  See 9.1(d) of Stalking Horse APA.

| | |
|---|---|
| Petition Date | Commencement of Chapter 11 Case. |
| Petition Date | Filing of Debtor-in-Possession Financing Motion. |
| Petition Date | Filing of Section 363 Sale Motions. |
| January 21, 2014 | Obtain Interim Financing Order. |
| February 7, 2014 | Obtain Final Financing Order. |
| February 7, 2014 | Receive Approval of Stalking Horse Bid and other Bidding Procedures. |
| February 28, 2014 | Submission of any "qualified topping bids" by Acceptable Purchasers. |
| March 5, 2014 | Conduct Auction should a qualified topping bid from a least one Acceptable Purchaser be received. |
| March 7, 2014 | Approval hearing and entry of sale order. |
| March 24, 2014 | Sale Closing. |

viii.    ***Good Faith Deposit:***  As the majority of the Purchase Price is comprised of a credit bid, the Stalking Horse APA does not require the Buyer to provide a good faith deposit. However, the proposed Bidding Procedures contemplate that any bidder shall provide a good faith deposit equal to 10% of the aggregate value of the bidder's bid.  Such good faith deposit will be forfeited if the bidder is the successful bidder (approved by the Court) and fails to close at no fault of the Debtor or if the bidder is the backup bidder (approved by the Court) and fails to close (to the extent required to close) at no fault of the Debtor.

ix.    ***Interim Arrangements with Proposed Buyer:***  None.

x.    ***Use of Proceeds:***  The proposed Sale Order proposes to authorize the Debtor to use the Purchase Price Cash Component to pay the Debtor's

secured lenders (except for the Buyer) in full upon closing the transaction contemplated in the Stalking Horse APA.

xi.    ***Tax Exemption:*** None.

xii.    ***Record Retention:*** As set forth in Section 7.2(c) of the Stalking Horse APA, on and for a period of seven years after the Closing Date, the Seller and the Seller's Representatives shall have reasonable access to all of the books and records of the Seller delivered to the Buyer or any Buyer Designee at Closing or pursuant to Section 7.2(b) of the Stalking Horse APA, including all Documentary Materials and all other information pertaining to the Assumed Agreements and Assumed Real Property Leases to the extent that (i) such books, records and information relate to any period prior to the Closing Date and (ii) such access is reasonably required by the Seller in connection with the Bankruptcy Case, the Excluded Liabilities, the Excluded Assets or similar matters relating to or affected by the operation of the Business for periods prior to the Closing. Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours, and the Buyer shall permit the Seller and the Seller's Representatives to make such reasonable copies of such books, records and information as they may reasonably request at the Seller's sole cost and expense.

xiii.    ***Sale of Avoidance Actions:*** As set forth in Section 2.1(t) and (u) and 7.18(b) of the Stalking Horse APA, the Debtor is selling any Avoidance Actions that relate to the Buyer and to any Purchased Assets or Assumed Liabilities and the Debtor is releasing any non-debtor parties from such Avoidance Actions.

xiv.    ***Request Findings as to Successor Liability:*** As set forth in Section U, AA, BB and 26-29 of the Sale Order, the Sale Order provides certain findings related to limiting the Buyer's successor liability.

xv.    ***Credit Bid:*** As set forth in 3.1 of the Stalking Horse APA and iii. above, the Buyer is credit bidding the Purchase Price Credit Bid Component. The Purchase Price Cash Component is expected to be sufficient to pay in full in cash all secured debt (other than that owed to Solvay). It is a condition of such sale that secured debt be paid in full in cash at Closing and that, as a result thereof, the UDC License be deemed terminated and of no further force or effect.

xvi.    ***Relief from Bankruptcy Rule 6004(h):*** As set forth in this Motion, the Debtor is seeks relief from the fourteen day stay imposed by Bankruptcy Rule 6004(h).

23.    The sale of the Purchased Assets to Solvay (or to such other Qualified Bidder (as defined below) that provides a higher or better offer for the Purchased Assets in accordance with the Bidding Procedures) is the best method to obtain the maximum value for the estate and the Debtor's creditors.   The DIP Facility is designed to provide liquidity sufficient to allow the Debtor to maintain its operations, and going-concern value, until the sale of the Purchased Assets can be completed.   Absent an expedited sale, the value of the Debtor as a going-concern will be jeopardized because the Debtor will not have sufficient liquidity to continue operating.

### The Bidding Procedures, the Auction and the Sale Hearing

24.    The Debtor requests that the Bidding Procedures be established to govern the sale process.  Although the Debtor conducted an extensive pre-bankruptcy marketing campaign with the assistance of Cowen, to maximize recovery for the estate, the Debtor negotiated with Solvay the terms of the Bidding Procedures, which are designed to establish a fair, open and competitive postpetition bidding process, subject to the time limitations driven by the Debtor's illiquidity and ongoing negative cash flow.  The Debtor will solicit bids for the Purchased Assets to ensure that the Debtor achieves the best price for the Purchased Assets under all of the circumstances.

25.    Other than as specifically provided in the Stalking Horse APA or Modified Agreement (as defined below), any Sale of the Purchased Assets shall be without representation or warranties of any kind, nature or description by the Debtor, its agents or the estate.  Other than as specifically provided in the Stalking Horse APA or Modified Agreement, as applicable, all of the Purchased Assets shall be transferred "as is," "where is" and "with all faults."  **THE DEBTOR EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY OF THE PURCHASED ASSETS, IN EACH CASE OTHER THAN AS SPECIFICALLY**

**PROVIDED IN THE STALKING HORSE APA OR MODIFIED AGREEMENT, AS APPLICABLE.**

26.    The following sets forth a summary of the key provisions of the Bidding Procedures, including those provisions required to be highlighted under Local Rule 6004-1:[3]

    i.    ***Provisions Governing Qualification of Bidders:*** As set forth in Section 12 of the Bidding Procedures, a "**Qualified Bidder**" is a Potential Bidder that (a) submits a Qualified Bid meeting all of the requirements as set forth in Paragraph 15 of the Bidding Procedures (see below) by the Bid Deadline, and (b) the Debtor, in consultation with the Committee and the DIP Lender, reasonably determines in the exercise of its reasonable business judgment is likely (based on financial and other information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtor), to be able to consummate the purchase of the Assets included in the Bid submitted by such Potential Bidder (including the ability to demonstrate adequate assurance of future performance under all executory contracts or unexpired leases to be assigned to such Potential Bidder) if selected as the Successful Bidder within the time frame set forth in these Bidding Procedures. The Stalking Horse Bidder is a Qualified Bidder for all purposes under the Bidding Procedures

    ii.    ***Provisions Governing Qualified Bids:*** As set forth in Section 15 of the Bidding Procedures, all Bids, other than the Stalking Horse Bid, must be received by the deadline set forth in the Bidding Procedures Order, which shall be no later than 5:00 p.m. (Prevailing Eastern Time) on February 28, 2014, and include (unless such requirement is waived by the Debtor with the prior written consent of the Stalking Horse Bidder, which may be granted or withheld in its sole discretion) the following information and documents and otherwise comply with the following (the "**Qualified Bid Requirements**"):

        a.    A cash purchase price equal to or greater than $32,612,276 plus the Overbid Amount (as defined below) (the "**Stalking Horse Purchase Price**");

        b.    Identify with particularity (a) the Assets of the Debtor to be acquired, including the Assumed Liabilities, as well as any Excluded Assets, and (b) the Debtor's executory contracts and unexpired leases with respect to which the bidder seeks to receive an assignment;

---

[3]    This summary is qualified in its entirety by the Bidding Procedures. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed such term in the Bidding Procedures. To the extent there are any conflicts or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

c. An executed copy of the bidder's proposed asset purchase agreement, accompanied by all exhibits and schedules contemplated by the agreement, and, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the agreement with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as a blackline marked to show any variations from the Stalking Horse APA (collectively, the "**Competing Agreement**"). All Qualified Bids must provide a commitment to close not later than fifteen (15) days after the entry of the order approving the sale (the "**Closing Deadline**");

d. A good faith cash deposit equal to 10% of the aggregate value of the bidder's Bid (excluding the value of the Assumed Liabilities), paid by wire transfer of immediately available funds (the "**Bid Deposit**") which shall be placed in the Escrow Account;

e. Fully disclose, to the reasonable satisfaction of the Debtor, after consultation with the Committee and the DIP Lender, (i) the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such Bid, (ii) the complete terms of any such participation, and (iii) if an entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such entity, and the financial capacity of such parties to satisfy such liability;

f. A representation stating that the bidder is financially capable of consummating the transactions contemplated by the Competing Agreement and any related transaction documents, as well as current audited financial statements and latest unaudited financial statements of the bidder or, if the bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the bidder who will guarantee the obligations of the bidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Debtor, in consultation with the Committee and the DIP Lender, to make a reasonable determination, by the Initial Qualification Deadline, as to the bidder's financial and other capabilities to consummate the proposed transaction. If the bidder will use financing to fund all or any portion of its bid, such bidder shall include written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that (i) provides for the Debtor as a third party beneficiary of such commitment for financing and (ii) will allow the Debtor, in consultation with the Committee and the DIP Lender, to make a reasonable determination as to the bidder's financial and other capabilities to consummate the proposed transaction;

<u>provided</u>, <u>however</u>, that no Qualified Bid may contain a financing contingency;

g.  A representation stating: (a) the bidder will consummate and fund the proposed transaction by no later than the Closing Deadline; and (b) the bidder's Bid is irrevocable until the first business day after the latest of the following: (i) if the bidder is not designated either the Successful Bidder or the Backup Bidder (as defined below), then the Sale Hearing; (ii) if the bidder is designated the Successful Bidder, then the closing of the transaction; and (iii) if the bidder is designated the Backup Bidder, then 5:00 p.m. (Prevailing Eastern Time) on the fifth (5th) business day following the date set for the closing of the Sale to the Successful Bidder (and such Backup Bidder shall be prepared to close the transaction on or before such date) (the "**Backup Bid Closing Deadline**");

h.  A representation of the bidder that it will be able to provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed and assigned under Bankruptcy Code section 365, as well as written evidence that the Debtor, in consultation with the Committee and the DIP Lender, believes to be sufficient to demonstrate the foregoing;

i.  Not request or entitle the bidder to any transaction or breakup fee, expense reimbursement, termination or similar type of fee or payment and shall contain an acknowledgment and representation to that effect, as well as a waiver of any rights to assert substantial contribution under section 503(b) of the Bankruptcy Code;

j.  Not contain any due diligence, financing or regulatory contingencies of any kind;

k.  An acknowledgement and representation that the bidder (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, other than as expressly provided in the Competing Agreement;

l.  State that the offering party consents to the jurisdiction of the Bankruptcy Court; and

m.  Include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the

submission, execution, delivery and closing of the Competing Agreement.

iii.     ***Provisions Providing Bid Protections to Stalking Horse Bidder:***

    a.   No-Shop or No-Solicitation Provisions.    None after entry of the Bidding Procedures Order.

    b.   Break-Up/Topping Fees and Expense Reimbursement.    There is no Break-Up Fee.  As set forth in Section 36 of the Bidding Procedures, to reimburse the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into the Stalking Horse APA with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtor has agreed to reimburse the Stalking Horse Bidder for actual and reasonable expenses associated with the Stalking Horse APA (including the actual and reasonable fees and costs of the Stalking Horse Bidder's attorneys and other advisors) (the "**Expense Reimbursement**").  For bidding purposes only, the Stalking Horse Bidder's expense reimbursement right will be fixed at $500,000.  The Expense Reimbursement shall be paid in accordance with the Stalking Horse APA and the Bidding Procedures Order.  To the extent provided in the Stalking Horse APA, such amount shall constitute super-priority administrative expenses of the Debtor's estate (subject to and junior to (a) any super-priority claims arising under the DIP Facility and (b) the Carve-Out (as defined under any interim or final order approving the DIP Facility, or the credit agreement governing the DIP Facility)) and, to the extent not previously paid, shall be paid directly out of the proceeds of the Sale.

    c.   Bidding Increments.    As set forth in Section 22(f) of the Bidding Procedures, for the bid of any Qualified Bidder other than the Stalking Horse Bidder to be a Qualified Bid, it must exceed the Stalking Horse Bid by at least five percent (5%) of the Stalking Horse Bid (the "**Overbid Amount**" and any qualified overbid, an "**Overbid**").  Additionally, the Auction will proceed in minimum increments of at least $100,000.

    d.   Treatment of Expense Reimbursement at Auction.    The Stalking Horse Bidder shall be given credit for the Expense Reimbursement in any additional bids submitted by the Stalking Horse Bidder and in each round of bidding at the Auction.

iv.     ***Modification of Bidding and Auction Procedures:***  As set forth in Section 23 of the Bidding Procedures, to the extent permitted by the Stalking Horse APA, the Debtor, in the exercise of its fiduciary duties, may adopt additional rules for bidding at the Auction that, in its reasonable business

judgment, will better promote the goals of the bidding process, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, so long as such additional rules do not materially conflict with the procedures set forth herein, it being understood that any additional rule that conflicts with an express provision of these procedures shall constitute a material conflict therewith.

v.  ***Closing with Alternative Backup Bidders:***  As set forth in Section 30 of the Bidding Procedures, upon a determination by the Debtor, after consultation with the Committee and DIP Lender, that the Successful Bidder is a Defaulting Buyer, the Debtor will be authorized, but not required, to consummate a sale transaction with the Backup Bidder (unless the Stalking Horse Bidder is the Backup Bidder, in which case the Debtor shall consummate such transaction) on the terms and conditions of the Backup Bid without further order of the Bankruptcy Court.

### Assumption and Assignment of Executory Contracts and Unexpired Leases

27.    To facilitate and consummate the sale of the Purchased Assets, the Debtor seeks authority to assume and assign certain executory contracts and unexpired leases following the Auction, if any, pursuant to section 365(f) of the Bankruptcy Code under the Stalking Horse APA (collectively, the "Assigned Contracts").  Due to the nature of the bidding process, it is impossible for the Debtor to currently identify which such contracts or leases will require assumption and assignment to the Successful Bidder.  As such, the Debtor further seeks authority to establish the following Assumption and Assignment:[4]

i.  ***Assumption and Assignment Notices.***  Within two (2) business days after entry of the Bidding Procedures Order or as soon thereafter as practicable, the Debtor will file with this Court and serve the Assumption and Assignment Notice, substantially in the form attached as **Exhibit 3** hereto, by first class mail, postage prepaid, facsimile, electronic transmission, hand delivery or overnight mail on (a) each counterparty under each potential Assigned Contract (a "**Contract Counterparty**") and (b) its attorney, if known, in each case, at the last known address available to the Debtor provided, however, that the presence of any contract or lease on an Assumption and Assignment Notice does not constitute an admission that such Contract or Lease is an executory contract or unexpired lease.  The

---

[4]    This summary is qualified in its entirety by the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed such term in the Bidding Procedures Order.  To the extent there are any conflicts or inconsistencies between this summary and the Bidding Procedures Order, the terms of the Bidding Procedures Order shall govern in all respects.

Debtor reserves all of its rights, claims and causes of action with respect to the Assigned Contracts. The Assumption and Assignment Notice shall set forth the following information: (i) the contract(s) and/or lease(s) that may be assumed by the Debtor and assigned to the Stalking Horse Bidder/Successful Bidder(s); (ii) the name and address of the Contract Counterparty thereto; (iii) notice of the proposed effective date of the assignment (subject to the right of the Debtor and/or the Stalking Horse Bidder/Successful Bidder to withdraw such request for assumption and assignment of the Assigned Contract(s) prior to the Closing); (iv) the amount, if any, determined by the Debtor to be necessary to be paid to cure and compensate for any existing default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "**Cure Amount**"); and (v) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of any Assigned Contract.

ii.   ***Notice of Successful Bidder.***  Within 48 hours, or as soon as practicable after the conclusion of the Auction, the Debtor shall file with the Court and serve by facsimile, electronic transmission, hand delivery or overnight mail on the Contract Counterparty (and its attorney, if known) to each Assigned Contract a notice:  (a) identifying the Successful Bidder; (b) stating which executory contracts and/or unexpired leases will be assumed and assigned thereto; and (c) containing a statement as to the Successful Bidder's ability to perform the Debtor's obligations under the applicable Assigned Contracts.

iii.   ***Objections to Assumption of Contracts.***

(a) Any objections to the assumption and assignment of any Assigned Contract (each a "**Contract Objection**"), including without limitation any objection to the Debtor's proposed Cure Amount or the provision of adequate assurance of future performance under any Lease or Contract pursuant to section 365 of the Bankruptcy Code ("**Adequate Assurance**"), must:  (a) be in writing and signed by counsel or attested to by the objecting party; (b) filed with the Clerk of the Bankruptcy Court, 824 Market Street N, [5th/6th] Floor, Wilmington, DE 19801, by the Sale Objection Deadline (as defined below) (or the Supplemental Objection Deadline, as applicable) (each as defined below); (c) identify the lease or contract to which the objector is party; (d) describe with particularity any cure or other compensation the claimant contends is required under section 365 of the Bankruptcy Code (the "**Alleged Cure Claim**") and identify the basis(es) of the Alleged Cure Claim under the Contract or Lease; (e) attach all documents supporting or evidencing the Alleged Cure Claim; (f) if the response contains an objection to Adequate Assurance, state with specificity what the objecting party believes is required to provide Adequate Assurance; and (g) be served in accordance with the Local

Rules so as to be received on or before the relevant objection deadline by the following parties: (i) the Debtor's counsel, Campbell & Levine, LLC, 310 Grant Street, 1700 Grant Building, Pittsburgh, PA 15219, Attn: Paul J. Cordaro, Esq. and Campbell & Levine, LLC, 222 Delaware Avenue, Suite 1620, Wilmington, DE 19801, Attn: Mark T. Hurford, Esq.; (ii) counsel to the Stalking Horse Bidder, Mayer Brown LLP, Attn: Thomas S. Kiriakos, Esq., 71 S. Wacker Drive, Chicago, IL 60606, and Cousins Chipman & Brown, LLP, Attn: William E. Chipman, Jr., Esq., 1007 North Orange St., Suite 1110, Wilmington, DE 19801; (iii) counsel to the Committee, if one is appointed; and (iv) all other parties that have requested notice in this Chapter 11 case (collectively, the "**Assigned Contract Objection Procedures**").

(b) Any objection to the Cure Amount or Adequate Assurance which is timely filed and served by any Contract Counterparty in accordance with the Assumption and Assignment Notice and/or the Assigned Contract Objection Procedures, and which is not otherwise resolved by the parties, shall be heard by this Court at the Sale Hearing.

(c) If no Contract Objection is timely and properly filed and served in accordance with the Bidding Procedures Order and the Assigned Contract Objection Procedures, then the Cure Amount, if any, set forth in the Assumption and Assignment Notice shall be binding upon all Contract Counterparties to each such Assigned Contract for all purposes in this Chapter 11 case and will constitute a final determination of the total Cure Amount, if any, required to be paid in connection with the assumption by the Debtor and the assignment to any purchaser. In addition, each Contract Counterparty shall be forever barred from objecting to the Cure Amount set forth in the Assumption and Assignment Notice, including, without limitation, the right to assert any additional cure or other amounts with respect to the Assigned Contract. The Court will make its determinations concerning Adequate Assurance under the Assigned Contracts pursuant to 11 U.S.C. § 365(f) at the Sale Hearing, or as soon as practicable thereafter. All Cure Amounts shall be paid in accordance with the Stalking Horse APA (or such other Modified Agreement between the Debtor and the Successful Bidder).

iv.    Supplemental Assumption and Assignment Notice Procedures

(a) If, at any time after the entry of the Bidding Procedures Order, the Debtor or any Qualified Bidder identifies additional prepetition executory contracts and/or unexpired leases to be assumed and assigned to the Stalking Horse Bidder or other Successful Bidder as Assigned Contracts (whether before or after closing of the Sale), as applicable, the Debtor shall serve a supplemental Assumption and Assignment Notice by facsimile, electronic transmission, hand

delivery or overnight mail on the applicable Contract Counterparty (and its attorney, if known) to each supplemental Assigned Contract at the last known address available to the Debtor by no later than ten (10) days before the proposed effective date of the assignment. Each Supplemental Assumption and Assignment Notice shall set forth the following information: (i) the name and address of the Contract Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the Debtor and Stalking Horse Bidder/Successful Bidder to withdraw such request for assumption and assignment of the Assigned Contract prior to the assignment thereof), (iii) identification of the Assigned Contract, (iv) the Cure Amount, if any, and (v) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of any Assigned Contract (each a "**Supplemental Assumption and Assignment Notice**").

(b) Unless the Contract Counterparty properly files and serves a Contract Objection to the Supplemental Assumption and Assignment Notice in accordance with the Bidding Procedures Order and the Assigned Contract Objection Procedures within ten (10) days of the date of the Supplemental Assumption and Assignment Notice (the "**Supplemental Objection Deadline**"), the Debtor shall be authorized to assume and assign the Assigned Contract, subject to the occurrence of the Closing, without further order or notice of hearing. If a Contract Objection is filed and served in accordance with the Bidding Procedures Order and the Assigned Contract Objection Procedures, and the objection cannot be resolved consensually, then the Debtor will schedule a hearing to consider the objection on the next scheduled omnibus hearing date (which may be the Sale Hearing).

(c) Any Contract Counterparty failing to timely and properly file and serve a Contract Objection prior to the Sale Objection Deadline (or the Supplemental Objection Deadline, as applicable) in accordance with the Bidding Procedures Order shall be deemed to consent to (i) the treatment of its Assigned Contract under section 365 of the Bankruptcy Code, (ii) the assumption and assignment of its Assigned Contract notwithstanding any anti-alienation provision or other restriction on assumption or assignment, and (iii) the provision of Adequate Assurance of future performance by the applicable assignee.]]

## RELIEF REQUESTED

28.   By this Motion, the Debtor seeks: (a) entry of the Bidding Procedures Order

(i) approving bidding procedures in connection with the sale of substantially all of the assets of

the Debtor, (ii) authorizing the Debtor to enter into the Stalking Horse APA and approving the reimbursement of the Stalking Horse Purchaser's expenses, (iii) approving the form and manner of notice of the Sale Hearing, and (iv) approving certain procedures related to the assumption and assignment of executory contracts and unexpired leases; and (b) following the Sale Hearing, entry of a Sale Order (i) authorizing the Debtor to sell the Purchased Assets to the Successful Bidder, (ii) authorizing the assumption and assignment of the Assigned Contracts to be set forth in the Stalking Horse APA, and determining the amount of any cure payment required to be paid in connection therewith, (iii) finding that the successful bidder:  (x) is a good faith purchaser of the Purchased Assets; (y) is qualified to acquire the Purchased Assets; and (z) therefore will acquire the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and (iv) waiving the fourteen (14) day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).

## BASIS FOR RELIEF

### A.    Conducting a Public Auction Pursuant to the Sale Procedures is in the Best Interests of the Estate and the Creditors.

29.    Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A proposed use or sale of property pursuant to section 363(b) is appropriate if "some articulated business judgment" exists for the transaction. *See, e.g., Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) (quoting *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (6th Cir. 1986)); *Fulton State Bank v. Schipper (In re Fulton State Bank)*, 933 F.2d 513, 515 (7th Cir. 1991).  The Debtor seeks approval of the Bidding

Procedures as a means to maximize the value of the recovery for its creditors through the sale of the Purchased Assets.

30.    Bankruptcy courts applying section 363 frequently have considered and approved bidding procedures in advance of a proposed sale of property of the estate. *See, e.g.*, *Doehring v. Crown Corp. (In re Crown Corp.)*, 679 F.2d 774, 775 (9th Cir. 1982) (noting that the district court had required specified minimum overbid amounts, deposits, and the form of purchase agreement to be used by bidders); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 878-879 (Bankr. S.D.N.Y. 1990) (noting that the bankruptcy court had entered an order requiring that overbids be made in specified minimum increments with deposits); *In re Adelphia Commc'n Corp.*, 336 B.R. 610, 629-30 (Bankr. S.D.N.Y. 2006) ("It is the common practice for bankruptcy courts, in connection with the sales of businesses or lines of business, to enter orders approving bidding procedures and bidding-related obligations . . . before being asked to approve the resulting sale itself.").

31.    A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbidding procedures and termination fee arrangements that have been negotiated by a debtor-in-possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

32.    In analyzing the propriety of bidding procedures, a court will examine whether such procedures allow third parties to submit higher and better bids and whether potential bidders have sufficient time to conduct their own due diligence. *In re Edwards*, 228 B.R. 552,

561 (Bankr. E.D. Pa. 1998) (requiring bidding procedures that allow for "an open and fair public sale designed to maximize value for the estate"); *In re Fin. News Networks, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), *appeal dismissed*, 931 F.2d 217 (2d Cir. 1991).  Moreover, the hallmarks of good faith in any sale procedure are the receipt of adequate value through higher and better offers and full and accurate disclosure of the terms of the proposed sale to third parties invited to bid.

> *1.     The Proposed Bidding Procedures Will Maximize the Value of the Purchased Assets by Allowing Competing Bidders to Participate in an Auction.*

33.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g.*, *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1998))).

34.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (stating such procedures should "encourage bidding and [ ] maximize the value of the Debtors' assets"); *In re Financial News Network, Inc.*, 126 B.R. at 156 (S.D.N.Y. 1991) (stating that "court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [ ] provide for a fair and efficient resolution of bankrupt estates").

35.     Here, the proposed Bidding Procedures will allow and encourage interested parties to submit competing bids at the Auction, thereby maximizing the value that the Debtor will receive for the Purchased Assets, yet at the same time ensure that any Overbid provides more than what Solvay has offered.  By inviting others to participate in the Auction, the Debtor will be able to determine the highest and best price possible for the Purchased Assets.  The Bidding Procedures will increase the likelihood that the Debtor will receive the greatest consideration possible for the Purchased Assets and will facilitate a competitive and fair bidding process, subject to the limitations imposed by the Debtor's severe liquidity constraints.

36.     Absent a prompt sale, the value of the Debtor's assets will decline because of the Debtor's ongoing cash flow difficulties.  The DIP Lender has agreed to provide financing pursuant to Bankruptcy Code § 364, which will fund the Debtor's cash operating needs as a going concern through mid-March, 2014, and for approximately 30 days thereafter on a wind-down basis.  As such, if a sale of the Purchased Assets is not closed by March 24, 2014, the Debtor will not be able to fund its ongoing going concern expenses.

37.     The proposed Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  The Bidding Procedures and the Stalking Horse Bid from Solvay:   (1) will encourage, rather than hinder, bidding for the Purchased Assets; (2) are consistent with other procedures previously approved by courts in this district; and (3) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  *See In re Randall's Island Family Golf Ctrs., Inc.*, 261 B.R. 96 (Bankr. S.D.N.Y. 2001), *aff'd*, 272 B.R. 521 (S.D.N.Y. 2002); *In re Integrated*

*Res., Inc.*, 147 B.R. at 650-56; *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989).

>    2.    *Potential Bidders Will Have Time to Conduct Due Diligence*

38.    As noted above, the Debtor, with the assistance of Cowen, has been looking for strategic buyers, financial buyers and capital providers since 2010.  Through that process, the Debtor has exhaustively marketed itself and the Purchased Assets for sale.  Pre-petition, several interested parties conducted initial due diligence.  Nonetheless, the Bidding Procedures will allow any prospective bidders and other interested parties time before the Bid Deadline to conduct any due diligence required.  If other interested parties are discovered, the Debtor will provide every possible opportunity to such parties to conduct the due diligence such parties need to submit the best possible Qualified Bid.  Therefore, potential bidders will have time to conduct due diligence with respect to the Purchased Assets.

>    **B.    The Manner of Notice and Schedule for the Bid Deadline and the Auction and Sale Hearing Are Reasonable and Appropriate Under the Circumstances.**

39.    The Debtor also respectfully requests that the Court approve the manner of notice of the proposed Auction and Sale Hearing pursuant to the Sale Notice attached as <u>Exhibit [  ]</u> to the Bidding Procedures Order (the "<u>Sale Notice</u>").  The Debtor submits that this relief will facilitate the sale process and enable the Debtor to provide interested parties with adequate and sufficient notice of the Auction and related matters.

40.    The Debtor proposes to give notice of this Motion, the Bidding Procedures Order, the Auction and the Sale Hearing in the following manner.  Within three (3) business days after entry of the Bidding Procedures Order (the "<u>Mailing Date</u>"), the Debtor will serve the Sale Notice by overnight mail, e-mail or facsimile upon:  (i) counsel to the Committee, if one is appointed; (ii) counsel to Solvay; (iii) the Office of the United States Trustee; (iv) all entities (or

counsel therefore) known to have asserted any lien, charge, claim or encumbrance on the Purchased Assets; (v) all federal, state and local regulatory or taxing authorities which are reasonably ascertainable by the Debtor to have a known interest in the Purchased Assets; (vi) known non-debtor counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the successful bidder; (vii) those parties who previously executed NDAs as part of the process conducted by Cowen prior to the Petition Date or expressed a bona fide interest in acquiring the Assets in the six (6) months preceding the date of this motion; and (viii) those parties who have requested notice pursuant to Bankruptcy Rule 2002.

41.    The Debtor submits that the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtor's creditors and other parties in interest, and also to all those who may bid on the Purchased Assets. Accordingly, the Debtor submits that such notice constitutes good and sufficient notice under the circumstances with respect to the Sale Motion, all proceedings to be held thereon, and the entry of an order or orders granting all of the relief requested herein. The Debtor further submits that no further notice need be given.

### C.    The Debtor Has Articulated a Reasonable Business Justification for the Sale of the Purchased Assets.

42.    Ample justification exists for approval of the proposed sale of the Purchased Assets. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

43.    A sale of a debtor's assets outside of the ordinary course of business should be approved if supported by a sound business purpose. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

44.    Courts typically consider the following factors in determining whether to approve a sale under section 363:    (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *See In re Del. & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re United Healthcare Sys., Inc.*, No. 97-1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

45.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983).    In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit

possible for the estate." (quoting *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988))), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

46.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos Related Litigants and/or Creditors v. Johns Manville Corp. (In re Johns Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

### 1.     Sound Business Justification Exists.

47.     As set forth above, the Debtor has determined that selling the Purchased Assets pursuant to the Bidding Procedures is the best way to maximize the value for the Debtor's creditors. The Debtor has come to this conclusion only after undertaking an extensive pre-petition effort to market itself and the Purchased Assets. Through such effort, the Debtor has exhausted the list of parties most likely to be interested in purchasing the Purchased Assets.

Solvay is the only party that submitted a concrete proposal to purchase the Purchased Assets during a four-month prepetition marketing effort.

48.     A sale of significant assets of a debtor during the early stages of a case is justified if (1) there would be substantial decrease in the value if the assets are not sold immediately, (2) existing customers and vendors would be reluctant to continue to do business with a company in a tenuous financial condition, and (3) the company would be unsustainable as a going concern due to lack of operating capital. *See In re Med. Software Solutions*, 286 B.R. 431, 331 (Bankr. D. Utah 2002). All three factors are present in this case. The Debtor will be able to sustain its ongoing operations as a going concern only through the financing being provided by the DIP Lender during the sale approval process. That financing will be exhausted by the end of March, 2014. Continued operation of the Debtor as a going concern is critical to maximizing value for creditors. The proposed expedited Bidding Procedures are designed to provide certainty to many of the Debtor's employees, who will know that a transaction is moving forward to fully fund ongoing operations and provide them with job security going forward. Therefore, the Debtor has demonstrated that a sound business justification exists to sell the Purchased Assets pursuant to the Stalking Horse APA.

> 2.     *The Notice of the Sale of the Assets Will Be Accurate and Reasonable Under the Circumstances.*

49.     As set forth above, the Debtor will provide accurate and reasonable notice of the sale of the Purchased Assets under all of the facts and circumstances of this case.

> 3.     *The Price For the Purchased Assets Will Be Fair and Reasonable.*

50.     The adequacy of purchase price is generally the function of whether the price was reached in good faith. *See In re Apex Oil Co.*, 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988) (holding that the consideration was adequate where it was negotiated in good faith); *In re*

*Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) (denying motion to sell where there was no evidence that the asset was diligently or sufficiently marketed). Here, the purchase price for the Purchased Assets will be set at the Auction with competitive bidding. Thus, the Debtor believes that the purchase price for the Purchased Assets will be the best price and will be fair and reasonable.

51.    The Debtor believes that it will be able to obtain the best offer available in the time allowed by its existing lack of liquidity through the Auction, in accordance with the Bidding Procedures, and that the purchase price it will obtain for the Purchased Assets will be the highest and best offer the Debtor could obtain for such assets. *See In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992) (stating that the purchase price is fair and reasonable if it is the highest and best offer).

       4.    *The Proposed Sale of the Purchased Assets Will Be Pursuant to the Stalking Horse APA, which is the Product of Good Faith.*

52.    Although section 363(b) of the Bankruptcy Code does not explicitly require good faith, courts have also required that a sale be made in good faith. *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992). The sale of the Purchased Assets to the successful bidder is proposed in good faith. Whether a proposed sale is in "good faith" focuses principally on the element of special treatment of the debtor's insiders in the sale transaction. *Id.*; *In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

53.    The sale of the Purchased Assets will be on the basis of Qualified Bids received by the Debtor by the Bid Deadline, and if more than one Overbid is received, then the best bid will be determined pursuant to the Auction. With respect to Solvay, its bid will be tested through a competitive marketing and bidding process. Furthermore, any bids submitted by potential buyers will be required to identify each entity that will be participating in such bid, and provide

sufficient financial and other information regarding both the prospective bidder and all other parties participating in the bid to satisfy the Debtor with respect to the requirements enumerated in section 363(m) of the Bankruptcy Code. Accordingly, regardless of who ultimately acquires the Purchased Assets, the sale will be the product of good faith.

> **D.    The Bankruptcy Court Should Approve the Assumption by the Debtor of the Assigned Contracts.**

54.     As stated above, to facilitate and effect the sale of its assets, the Debtor also seeks authority to assume and assign certain Assigned Contracts to the Successful Bidder.

55.     Section 365(a) and (b) of the Bankruptcy Code authorizes debtors to assume executory contracts or unexpired leases subject to the Court's approval, and requires debtors to satisfy certain requirements at the time of assumption. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

56.     The standard that is applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment"

that the assumption is in its economic best interests. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (superseded in part by 11 U.S.C. § 1113) (describing business judgment test as "traditional"); *In re III Enters., Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), *aff'd sub nom.*, *Pueblo Chem., Inc. v. III Enters. Inc., V.*, 169 B.R. 551 (E.D. Pa. 1994).

57.    It is well established that a court should approve a debtor's motion to assume or reject an executory contract or unexpired lease if the debtor's decision is based on its "business judgment." *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002); *Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard."), *aff'd*, No. 06-302-SLR, 2008 WL 522516 (D. Del. Feb. 27, 2008), *vacated and remanded*, 607 F.3d 957 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 1470 (2011); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).

58.    To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate."). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." *In*

*re Network Access Solutions Corp.*, 330 B.R. at 75.  Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion.  *See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003); *Lubrizol Enters. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985).

59.     In the present case, the Debtor's assumption and assignment of certain Assigned Contracts to the Successful Bidder meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.  The assumption and assignment of Assigned Contracts are necessary for any Successful Bidder to conduct business going forward, and since no purchaser would take the Purchased Assets without certain Assigned Contracts, the assumption and assignment of such Assigned Contracts is essential to inducing the highest and best offer for the Purchased Assets.  Further, upon consummation of the proposed sale of the Purchased Assets, the Debtor will no longer continue to operate its business and will therefore have no use for any of the Assigned Contracts utilized in its business.  Lastly, the proposed Assumption and Assignment Procedures ensure that all counterparties to Assigned Contracts to be assumed and assigned by the Debtor will have ample notice of such relief and an opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder to provide adequate assurance of future performance.

60.     Consequently, the Debtor submits that the Assumption and Assignment Procedures are fair and reasonable and respectfully request that the Court approve the Assumption and Assignment Procedures and authorize the Debtor to assume and assign any Assigned Contracts to the Successful Bidder.

**E.     The Debtor Has Satisfied the Other Provisions of Section 365 of the Bankruptcy Code Regarding Assumption of the Assigned Contracts.**

61.     In addition to the business judgment test, section 365(b)(1) of the Bankruptcy

Code provides that:

> If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or
> lease unless, at the time of assumption of such contract or lease,
> the trustee
>
> (A)     cures, or provides adequate assurance that the trustee will
> promptly cure, such default . . . ;
>
> (B)     compensates, or provides adequate assurance that the
> trustee will promptly compensate, a party other than the debtor to
> such contract or lease, for any actual pecuniary loss resulting from
> such default; and
>
> (C)     provides adequate assurance of future performance under
> such contract or lease.

11 U.S.C. § 365(b)(1).

62.     The Assumption and Assignment Notice (in addition to the Sale Notice) will

advise the Contract Counterparties to the Assigned Contracts that to the extent that any party

believes that there is an existing default under an Assigned Contract which requires a cure

payment, such party must object to the assumption and assignment of such Assigned Contracts

and will have an opportunity to raise its objection at the Sale Hearing. The Debtor will resolve

or have this Court rule on any such objections before the assumption of the corresponding

Assigned Contract becomes effective. If an objection cannot be resolved or ruled upon, the

Debtor reserves the right not to assume and assign that contract.

63.     Further, as discussed in detail below, the Debtor will require any prospective

bidder to provide evidence as to such bidder's ability to provide adequate assurance of future

performance. Thus, the Debtor has satisfied the statutory requirements for assumption, and the

Court should approve the decision to assume the Assigned Contracts as a proper exercise of its

respective business judgment.

**F.      The Court Should Approve the Assignment of the Assigned Contracts to the Successful Bidder as the Successful Bidder Can Provide Adequate Assurance of Future Performance.**

64.      To assign a contract or lease, a debtor must assume the contract or lease under section 365(b) of the Bankruptcy Code and provide adequate assurance of future performance. 11 U.S.C. § 365(f)(2).  The Debtor has satisfied the requirements for assumption and assignment pursuant to section 365(f)(2) of the Bankruptcy Code.

65.      First, the Debtor will satisfy the assumption criteria as discussed above at the Sale Hearing.   Second, the financial capability of and willingness to perform the post-assignment obligations under the Assigned Contracts by the successful bidder will constitute sufficient "adequate assurance of future performance" to justify the proposed assumption and assignment. *See, e.g.*, *In re Tech Hifi, Inc.*, 49 B.R. 876, 879 (Bankr. D. Mass. 1985) ("Adequate assurance of future performance with respect to the source of rent to be paid means that the proposed assignee has the ability to satisfy the financial obligations imposed by the lease.  An absolute guarantee, such as a letter of credit, is not required to meet this standard."); *In re PPK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999); *In re THW Enters., Inc.*, 89 B.R. 351, 357 (Bankr. S.D.N.Y. 1988).

66.      Solvay will provide information demonstrating that it has adequate resources to perform on a going forward basis to provide adequate assurance of future performance under the Assigned Contracts.  Furthermore, as part of any Overbid, the prospective purchaser will have to submit evidence of the prospective purchaser financial ability to close the transaction and provide adequate assurances of performance.

67.      In the event there is any objection by a non-debtor party to an Assigned Contract, the Debtor intends to supplement the Sale Motion with further evidence related to the abilities of the prospective bidders to perform under the Assigned Contracts prior to the Sale Hearing.

68.    Accordingly, the Debtor respectfully requests that the Court determine that at the time of the Sale Hearing, the Debtor and the successful bidder will have complied with the requirements of section 365(f)(2) of the Bankruptcy Code and approve the assumption and assignment of the Assigned Contracts to the successful bidder.

**G.    Expense Reimbursement Should be Approved**

69.    The Bidding Procedures provides that in the event that Solvay is not the successful bidder, it will be entitled to expense reimbursement for actual and reasonable expenses associated with the Stalking Horse APA (including the actual and reasonable fees and costs of the Stalking Horse Bidder's attorneys and other advisors) (the "Expense Reimbursement"), which will be deemed an allowed superpriority administrative expense claim under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, senior to all other administrative expense claims in this case.    Additionally, in the event the Stalking Horse APA is terminated (other than because it is not the successful bidder or because it breached the terms of the Stalking Horse APA), the Expense Reimbursement will be an allowed administrative expense claim against the Debtor under Section 503 of the Bankruptcy Code.

70.    Here, Solvay has conditioned its willingness to enter into the Stalking Horse APA on the Court's approval of, among other things, the Expense Reimbursement.    The Expense Reimbursement is limited to Solvay's actual and reasonable out-of-pocket expenses actually incurred.

71.    The Debtor submits that the Expense Reimbursement is justified to induce Solvay to enter into the Stalking Horse APA and to adequately reimburse Solvay for performing the substantial due diligence and incurring the expenses necessary and entering into the Stalking Horse APA.

72.    The Debtor submits that there may be no offer from Solvay or another bidder, unless the Court approves the Expense Reimbursement.  The proposed transaction with Solvay ensures that the Debtor will have at least one substantial offer for the Purchased Assets.  Solvay has agreed to keep its bid open and to provide the Debtor with financing to enable it to operate during the further solicitation and Auction Process during this bankruptcy case.

**H.    The Sale of the Purchased Assets Should Be Free and Clear of Liens, Encumbrances, and Interests**

73.    Section 363(f) of the Bankruptcy Code provides that the Court may authorize a sale of property of the estate, "free and clear of any interest in such property of an entity other than the estate," if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in *bona fide* dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *In re General Bearing Corp.*, 136 B.R. 361, 363-64 (Bankr. S.D.N.Y. 1992).

74.    Any holder of a security interest in the Purchased Assets will be served with a copy of the Sale Motion and will be given an opportunity to object.  To the extent that they do not object to the Sale Motion, they should be deemed to have consented to the proposed sale under Section 363(f)(2) of the Bankruptcy Code.  *See, e.g.*, *FutureSource, LLC v. Reuters, Ltd.*, 312 F.3d 281 (7th Cir. 2002), *cert. denied*, 538 U.S. 962 (2003) (holding that failure to object may constitute consent, if there was adequate notice).

75.     Moreover, pursuant to section 363(f)(5) of the Bankruptcy Code, a free and clear sale is permissible when the interest holders can otherwise be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interests.  11 U.S.C. § 363(f)(5).  *See In re Gulf States Steel*, 285 B.R. 497, 508-509 (Bank. N.D. Ala. 2002) (permitting sale free and clear of a steel mill under section 365(f)(5) over objections where each of the liens or interest could be compelled to accept a money satisfaction in a cram down plan in Chapter 11); *see also In re P.K.R. Convalescent Centers, Inc.*, 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing the sale of nursing home assets under § 363(f)(5) over objection where interest was reducible to a claim and subject to a hypothetical money satisfaction).  Importantly, section 363(f)(5) does not require that the sale price for the property must exceed the value of the interests, but rather, only that the mechanism exists to address extinguishing the lien or interest without paying such interest in full.  *See Gulf States*, 285 B.R. at 508.  However, notwithstanding the foregoing, here, the Stalking Horse Bid is expected to result in payment in full in cash of all secured claims owed to creditors (other than the Buyer).  Accordingly, the Debtor believes it has satisfied the requirements for a free and clear sale under section 363(f) of the Bankruptcy Code.

**I.     The Successful Bidder is Entitled to Good Faith Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code**

76.     As noted above, the Debtor requests as part of the approval of the proposed sale that the Court find that the successful bidder is qualified to acquire the Purchased Assets and will do so in good faith within the meaning of section 363(m) of the Bankruptcy Code.  To be a Qualified Bidder at the Sale Hearing, any potential bidder must provide sufficient financial and other information regarding both the prospective bidder and all other parties participating in the bid to satisfy the Debtor with respect to the requirements enumerated in section 363(m).

77.    Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith. . . ." 11 U.S.C. § 363(m).   Under section 363(m) of the Bankruptcy Code, "an appeal of a bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed property, unless the debtor [or other complaining party] stays the foreclosure [or other] sale pending an appeal." *Mann v. Alexander Dawson, Inc. (In re Mann)*, 907 F.2d 923, 926 (9th Cir. 1990). "[T]he primary goal of the mootness rule [embodied in Section 363(m)] 'is to protect the interest of a good faith purchaser . . . of the property,' thereby assuring finality of sales." *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1173 (9th Cir. 1988) (quoting *Community Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 901-02 (9th Cir. 1985)).   That goal is important in this case because the successful bidder needs assurance that the purchase of the Purchased Assets will not be subject to future attack by objecting creditors.   Such assurance is necessary to generate the maximum purchase price for such assets at the Sale Hearing.

78.    Lack of good faith for purposes of section 363(m) of the Bankruptcy Code is generally determined by the existence of fraudulent conduct or insider dealing during the sale process. *See, e.g.*, *In re Exennium, Inc.*, 715 F.2d 1401 (9th Cir. 1983).   In this case no such conduct or dealings have occurred as of the date of the Sale Motion and will not occur prior to the Sale Hearing.   All bidders will have to identify each entity that will be participating in such bid, including any proposed designee(s), and provide sufficient financial and other information

regarding both the prospective bidder and all other parties participating in the bid to satisfy the Debtor with respect to the requirements enumerated in section 363(m).

79.     As noted above, Solvay likely qualifies as an insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code as Solvay owns 47.2% of the outstanding voting capital stock of the Debtor.  Despite Solvay's status as an insider of the Debtor, significant measures have been taken to ensure the fairness of the sale process.  The members of the Debtor's Board of Directors designated by Solvay resigned in July, 2013.  Furthermore, and as noted above, Cowen, as the Debtor's investment banker, assisted the Debtor in its pre-petition sale process.  Finally, the Bidding Procedures and the terms of the Stalking Horse APA allow the Debtor to consider higher or otherwise better offers for the Purchased Assets, and Solvay is not seeking a break-up fee as part of the transaction.  The Debtor submits that these disclosures satisfy the conditions of Rule 6004-1 of the Local Rules.

80.     The protection of section 363(m) of the Bankruptcy Code is appropriate in this case because the proposed sale transaction will be the product of an open auction in Court and, to the extent necessary, arms' length, good faith negotiations between the Debtor, on the one hand, and the successful bidder, on the other.

## WAIVER OF STAY

81.     As set forth above, the DIP Facility expires the earlier of April 21, 2014 or when a termination event occurs, and the Debtor will not have the funds to pay its operating expenses after that date unless the proposed sale closes.  If the sale of the Purchased Assets cannot be consummated immediately following the Auction and the Sale Hearing, it is uncertain whether the Debtor can generate sufficient cash flow to operate.  Accordingly, the Debtor requests that the automatic fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## NOTICE

82.    The Debtor will provide notice of this Motion to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the parties included on the Debtor's list of twenty (20) largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (iii) counsel to the Debtor's prepetition and proposed postpetition secured lenders; and (iv) all parties who have requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

83.    This Motion asks that the Court approve a Sale Notice, substantially in the form annexed to the Bidding Procedures Order as Exhibit 2.  If the Court grants this Motion, the Debtor will serve the Sale Notice by overnight mail, e-mail or facsimile upon: (i) counsel to the Committee, if one is appointed; (ii) counsel to Solvay; (iii) the Office of the United States Trustee; (iv) all entities (or counsel therefore) known to have asserted any lien, charge, claim or encumbrance on the Purchased Assets; (v) all federal, state and local regulatory or taxing authorities which are reasonably ascertainable by the Debtor to have a known interest in the Purchased Assets; (vi) known non-debtor counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the successful bidder; (vii) those parties who previously executed NDAs as part of the process conducted by Cowen prior to the Petition Date or expressed a bona fide interest in acquiring the Assets in the six (6) months preceding the date of this motion; and (viii) those parties who have requested notice pursuant to Bankruptcy Rule 2002 on or before the Mailing Date.

WHEREFORE, the Debtor respectfully requests that the Court enter orders, substantially in the forms annexed hereto as Exhibits A and B, granting the relief requested by this Motion and such further relief as may be just and proper under the circumstances.

CAMPBELL & LEVINE, LLC

Dated: January 17, 2014
Wilmington, Delaware

/s/ Mark T. Hurford
Mark T. Hurford (DE No. 3299)
Ayesha C. Bennett (DE No. 4994)
222 Delaware Avenue, Suite 1620
Wilmington, Delaware 19801
Telephone: (302) 426-1900
Facsimile:  (302) 426-9947

and

CAMPBELL & LEVINE, LLC
Stanley E. Levine, Esq.
Paul J. Cordaro, Esq.
310 Grant Street
1700 Grant Building
Pittsburgh, PA 15219
Telephone: (412) 261-0310
Facsimile:  (412) 261-5066

*Proposed Counsel for the Debtor and Debtor-in-Possession*