## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PLEXTRONICS, INC. [1]<br><br>Debtor. | Chapter 11<br><br>Case No. 14-10080 (    ) |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING

Plextronics, Inc. as debtor and debtor in possession (the "Debtor"), hereby moves (the "Motion") this Court for: (1) entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Order") (a) authorizing the Debtor to (i) obtain post-petition senior secured superpriority financing; (ii) grant super-priority liens and super-priority claims to the DIP Lender; and (iii) use the cash collateral of the Investors and provide adequate protection to the Investors; (b) scheduling a hearing to consider the relief in this Motion on a final basis (the "Final Hearing") and (c) modifying the automatic stay to the extent necessary to effectuate the relief sought herein; and (2) entry of a final order granting the relief requested in this Motion on a final basis (the "Final Order," together with the Interim Order, the "DIP Orders").

In support of this Motion, the Debtor relies on the Declaration of William Snyder, Chief Financial Officer of the Debtor in Support of First Day Motions (the "Snyder Declaration"),

---

[1] The last four digits of the Debtor's tax payer identification number are: 1347. The Debtor's address is 2180 William Pitt Way, Pittsburgh, PA 15238.

sworn to on the date hereof.  In further support of this Motion, the Debtor respectfully represents as follows:

## BACKGROUND

A.    **The Debtor's Business and Performance**

1.    Founded in 2002 as a spinout from Carnegie Mellon University, the Debtor is a privately held corporation organized and existing under the laws of the State of Delaware.

2.    Headquartered in Pittsburgh, Pennsylvania, the Debtor is an international leader in the research, development and commercialization of conductive and semi-conductive polymers and ink formulations, which enable the commercialization of printed electronic devices.  These patented and trade secret-protected products are sold under the Plexcore® brand.  In turn, the Debtor focuses on applying its expertise to:  (a) organic light emitting diodes ("OLED") for flat panel displays, and (b) energy storage devices such as Lithium Ion batteries.  The Debtor's market penetration strategy is to:  (y) deliver critical materials that enable OLED TV displays in larger sizes with better performance and at lower costs, and (z) penetrate large existing markets for energy storage devices where battery makers can utilize superior technology to materially improve performance and cost.

3.    The Debtor's unique "product-by-process" methodology to manufacture materials and its deep expertise in advanced materials and device technology has led to a strong intellectual property portfolio.  Indeed, the Debtor owns approximately 240 patents and pending patent applications representing approximately 50 unique families of inventions owned or controlled worldwide.

4.    As of the Petition Date, the Debtor employed approximately 34 employees.

5.      As of December 31, 2013, the Debtor's books and records reflected assets totaling approximately $3 million and total liabilities of approximately $33 million.  For the calendar year ending December 31, 2013, the Debtor generated revenues of approximately $2 million and incurred net operating losses of approximately $14 million.

B.      **The Debtor's Capital and Debt Structure**

**Capital Structure**

6.      The Debtor is authorized to issue: (i) 231,340,000 shares of common stock, $.00001 par value per share, and (ii) 190,100,000 shares of preferred stock, $.00001 par value per share.  The authorized preferred stock is further divided and designated as follows:  (i) 91,000,000 shares of Series B-1 Preferred Stock, (ii) 43,300,000 shares of Series B Preferred Stock, (iii) 49,600,000 shares of Series A Preferred Stock, and (iv) 6,200,000 shares of Series A-1 Preferred Stock.  The Debtor has also issued various options and warrants to buy shares of the Debtor.

**Prepetition Credit Facilities**

7.      Beginning in 2011 and continuing through the Petition Date, the Debtor has obtained the following secured financing:

(i)      Up to $15,475,000 from Solvay America, Inc. successor by merger to Solvay North America Investments, LLC ("Solvay"), Newlin Investment Company, L.P. ("Newlin Investment"), William R. Newlin Grantor Retained Annuity Trust Agreement I Dated 4/4/2010, Ronald O'Kelley ("O'Kelley"), and LFLP, Ltd. (collectively, the "June 2011 Noteholders"), pursuant to certain loan documents, including a Convertible Note Purchase Agreement (as amended), five (5) Convertible Promissory Notes, and a Security Agreement (the "June 2011 Credit");

(ii)     $3,000,000 from SVIC No. 20 New Technology Business Investment L.L.P. ("Samsung"), pursuant to certain loan documents, including a Convertible Note Purchase Agreement, a Convertible Promissory Note, and a Security Agreement (the "Samsung Credit");

(iii)    $4,000,000 from UDC, Inc. ("UDC"), pursuant to certain loan documents, including a Convertible Note and Warrant Purchase Agreement, a Convertible Promissory Note, and a Security Agreement (the "UDC Credit");

(iv)    Up to $5,000,000 from Solvay, pursuant to certain loan documents, including a Convertible Note Purchase Agreement, a Convertible Note and a Security Agreement (the "May 2013 Credit"); and

(v)    Up to $5,000,000 from Solvay, as collateral agent for the benefit of Solvay, Newlin Investment and O'Kelley (collectively, the "Senior Noteholders"), pursuant to certain loan documents, including a Convertible Note and Warrant Purchase Agreement, various Convertible Notes, and a Security Agreement (the "Senior Secured Credit").

8.    The lien priority of the security interests granted by the Debtor and the obligations and agreements by and among the June 2011 Noteholders, Samsung, UDC, Solvay (collectively, the "Junior Noteholders", and collectively with the Senior Secured Noteholders, the "Investors") and the Senior Noteholders related to their respective convertible credits are set forth and described in that certain Third Amended and Restated Intercreditor Agreement dated September 20, 2013 (the "Intercreditor Agreement"). In short, although the Senior Secured Credit was issued last in time, the Intercreditor Agreement provides that the Senior Secured Credit is secured by a first priority and senior lien on substantially all of the Debtor's assets and the June 2011 Credit, Samsung Credit, UDC Credit and May 2013 Credit (collectively, the "Junior Secured Credits", and collectively with the Senior Secured Credit, the "Secured Credits") are secured by a subordinated lien on substantially all of the Debtor's assets.

9.    No principal or interest has ever been paid to the Senior Noteholders in connection with the Senior Secured Credit or the Junior Noteholders in connection with the Junior Secured Credits. As of December 31, 2013, the approximate amounts of principal and interest outstanding on the Secured Credits are as follows:

| Credit Facility | Approximate Amount Outstanding |
|---|---|
| Senior Secured Credit | $2,420,309 |
| June 2011 Credit | $17,187,927 |
| Samsung Credit | $3,155,750 |
| UDC Credit | $4,178,667 |
| May 2013 Credit | $2,622,778 |

C.    **Events Leading to the Filing of the Chapter 11 Case**

10.    As described above, the Debtor is a high technology research and development company that, by its very nature, has experienced operational losses since its inception.   Indeed, in the years leading up to 2011, while the Debtor generated relatively modest revenue and received governmental grants, such funds were insufficient to cover all of the expenses and such excess expenses were funded by equity infusions from shareholders.   Since 2011, the operational losses have been primarily funded by draws from the Secured Credits.

11.    In June 2010, the Debtor engaged Cowen and Company, LLC ("Cowen") as an advisor to provide the Debtor assistance and advice related to potential strategic alternatives, (including evaluating additional private capital raises, public markets and/or M&A opportunities), analyzing the Debtor's business and operations, and providing such other financial advisory and investment banking services as the parties may agree.

12.    In or about fall 2010, the Debtor commenced negotiations related to Solvay's potential acquisition of the Debtor through a staged stock acquisition.   In turn, in October 2010, the Debtor and Cowen supplemented and amended their June 2010 engagement letter to provide that

Cowen will act as the exclusive financial advisor to the Debtor in connection with the proposed Solvay staged stock acquisition. Unfortunately, in or about late fall 2010, Solvay informed the Debtor that the proposed acquisition was not approved by Solvay's board of directors and the acquisition was abandoned. Nevertheless, the Debtor and Cowen continued their efforts to find a recapitalization source for the Debtor.

13.    In this regard, in August 2011, the Debtor and Cowen amended and restated their existing engagement to provide, *inter alia*, for Cowen to serve as the exclusive placement agent for the Debtor. At that time, the goal was for Cowen to market the Debtor and identify an "accredited investor" to purchase and acquire the Debtor's securities.

14.    Meanwhile, in or about June 2011, Solvay completed a stock acquisition from certain third party shareholders whereafter Solvay acquired approximately 19% of the Debtor's outstanding voting capital stock from existing shareholders. Upon consummating this transaction, Solvay held (and holds as of the Petition Date) approximately 47% of the Debtor's outstanding voting capital stock. In connection with Solvay's acquisition, the June 2011 Noteholders provided the June 2011 Credit which, like the equity infusions that came before, was used to supplement the Debtor's operational expenses.

15.    Additionally, in April 2012, Samsung became an investor in the Debtor via the Samsung Credit and such funds were used to fund the Debtor's operational expenses.

16.    In July 2012, UDC and the Debtor negotiated the terms of a strategic alliance. Such alliance called for UDC to provide the UDC Credit and the parties also executed a Joint Development Agreement (the "JDA") whereby UDC and the Debtor intended to accelerate development, evaluation, and commercialization of certain products and UDC would, *inter alia*, provide the Debtor quarterly installments of $250,000 to assist in the joint development program.

Again, the funds from UDC were used to fund the Debtor's ongoing operations. On December 20, 2013, UDC provided written notice of its intent to terminate the JDA effective December 23, 2013. The JDA purports to provide a license to UDC of certain of the Debtor's intellectual property unless all amounts owing to UDC in connection with the UDC Credit are paid in full on or before March 31, 2014.

17.    During the fourth quarter of 2012, the Debtor along with Cowen actively marketed the Debtor for a Series C capital raise. In connection with this private placement, Cowen distributed a business overview to approximately 100 potential parties. In turn, Cowen conducted approximately 50 meetings/calls with potential financial/strategic/international investors.

18.    In or about early 2013, the Debtor (with Cowen's assistance) began negotiating with a potential investor whose investment would provide a short and long term solution for the Debtor's operational needs. To provide the Debtor the opportunity and time to develop this potential transaction, Solvay obtained approval from its management to provide the May 2013 Credit. Negotiations with the potential investor continued until April 2013, when the potential investor decided to disengage from discussions and pass on the opportunity shortly after such approval had been obtained from Solvay's management. After these discussions ended, Solvay nonetheless elected to proceed with providing the May 2013 Credit and the Debtor used the proceeds from the May 2013 Credit to fund continue operations while it considered alternative opportunities.

19.    By early summer 2013, it became apparent to the Debtor that it was not going to be able to raise additional investor funds within the milestones contained in the May 2013 Credit documents. As such, in or about July 2013, the Debtor decided that the best way to maximize value would be to market and sell its business and assets as a going concern. To provide the Debtor funding during this marketing and sale process, the Debtor and Solvay negotiated the terms and

conditions of the Senior Secured Credit which would fund the Debtor's operations through a sale process. During the negotiations, the Debtor and Solvay recognized that a Chapter 11 bankruptcy filing might be necessary to consummate any sale transaction, and therefore, the loan documents evidencing Senior Secured Credit provided a commitment for certain debtor-in-possession financing.

20.     At the same time, the Debtor instructed Cowen to identify potential acquirers for the company or substantially all of the Debtor's assets. Due to liquidity constraints, the marketing period for this process commenced immediately and concluded in December, 2013. Utilizing the list of parties who expressed an interest during the Series C private placement, Cowen along with the Debtor contacted approximately 20 parties in connection with the proposed sale of the Debtor's assets.

21.     Of the parties contacted by Cowen and the Debtor during the sale process, approximately 10 parties requested further meetings with the Debtor's management team. Following these initial informational sessions, certain parties requested additional information from the Debtor and engaged in various individualized diligence sessions.

22.     The Debtor and Cowen were unable to identify a buyer ready and able to close within the sale and marketing timeframe of approximately July 2013 through December 2013. Upon determining that the sale process would not produce a timely sale and it became clear the Debtor would not be able to meet the conditions for future funding under the Senior Secured Credit documents, the Debtor and Solvay commenced negotiations for the potential sale and purchase of the Debtor's assets. These negotiations resulted in a written term sheet detailing the general terms surrounding Solvay's acquisition of the Debtor's assets.

23.     Given the Debtor's deteriorating cash situation and its significant financial losses arising from its operations, coupled with its inability to find any parties willing to provide additional

capital requirements, the Debtor and its advisors determined that an out-of-court restructuring was not achievable. Based upon the determination that the proposed sale could only be consummated in the context of this bankruptcy proceeding, the Debtor and Solvay negotiated the APA (as defined below), which provides that Solvay will serve as a stalking horse bidder to facilitate a sale pursuant to Bankruptcy Code section 363. The Debtor believes that other potential buyers may be willing to participate in the 363 sale process.

D.    **The Chapter 11 Filing and Objectives Therein**

24.    On January 16, 2014 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

25.    In spite of its ongoing operational losses, the Debtor has significant valuable assets and going concern value. After considering other alternatives and in an effort to maximize the value of the Debtor's assets and maintain jobs for employees, the Debtor has engaged in negotiations with Solvay for the sale and purchase of the Debtor's assets. In connection with these negotiations, the Debtor and Solvay determined that any such a sale should occur inside a Chapter 11 case so that the sale could be subject to higher and better offers and would provide the most flexibility to other potential bidders. The Debtor and Solvay have executed an Asset Purchase Agreement (the "APA") for the sale of substantially all of the Debtor's assets.

26.    The Debtor was also able to negotiate the use of the Investors cash collateral and the entry of a debtor in possession financing credit agreement (the "DIP Facility") with Solvay. The Debtor believes that the use of the Investors' cash collateral and the DIP Facility provide the Debtor with sufficient liquidity to complete a bankruptcy court supervised sale process that will enable the Debtor to maximize the value of its estate.

{P0329457.1 }

27.    To this end, the Debtor filed a motion seeking approval of a sale process, including bid procedures, pursuant to which the Debtor will use Solvay as the stalking horse and the APA as the stalking horse bid.  Notwithstanding and as expressly contemplated by Solvay's bid (subject to an approximate 21 day blackout period whereby no marketing can be performed), the Debtor will aggressively market its assets as a going concern in an effort to locate as many other potential bidders as possible and solicit higher and better offers.  Accordingly, after considering other alternatives, the Debtor concluded that the most effective way to maximize the value of its estate for the benefit of creditors and preserve as many jobs as possible is by commencing this Chapter 11 Case to complete a prompt sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code, subject to higher and better bids at a public auction.

## JURISDICTION AND VENUE

28.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

29.    The statutory predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(e) and 507 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware (the "Local Rules").

## RELIEF REQUESTED

30.    By the Motion, and for the reasons contained herein as well as the Snyder

Declaration, and pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(e) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2, the Debtor respectfully requests that the Court:

      a.      authorize the Debtor, among other things, to: (i) obtain up to $1,660,000 in post-petition financing pursuant to the DIP Facility; (ii) use the Cash Collateral; (ii) grant first priority, senior secured, super-priority liens and superpriority claims to the DIP Lender; and (iv) grant adequate protection to the Investors;

      b.      approve the DIP Facility and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lender;

      c.      schedule the Final Hearing to be held within thirty (30 days) of the entry of the Interim Order; and

      d.      grant certain related relief, in each case on the terms and subject to the conditions described in this Motion and set forth in the Interim Order and the DIP Facility.

### SUMMARY OF PRINCIPAL TERMS OF DIP FACILITY AND INFORMATION REQUIRED BY LOCAL RULE 4001-2

      31.      Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following are material provisions of the DIP Facility and the Interim Order, as well as those provisions required to be set forth under Local Rule 4001-2(a)(i)[2]:

| The Borrower: | Debtor, Plextronics, Inc. |
|---|---|
| | *See*, Debtor-in-Possession Financing Supplement to Convertible Note and Warrant Purchase Agreement (the "DIP Loan Agreement"),[3] at page 10. |
| The DIP Lender: | Solvay America, Inc. |

[2] Unless otherwise specified, the capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Facility and the Interim Order, as applicable. The summaries and descriptions of the terms and conditions of the DIP Facility and the Interim Order set forth in this Motion are intended for informational purposes for the Court and other parties in interest. In the event, of any inconsistency between this Motion and the summary contained herein, the DIP Facility and the Interim Order shall govern.

[3] The DIP Loan Agreement is attached hereto as Exhibit B.

*See*, DIP Loan Agreement, Schedule C

| | |
|---|---|
| Interim and Final Financing Commitment: | The DIP Facility (the DIP Note[4], together with the DIP Loan Agreement and all other documents, agreements or instruments in connection therewith or related thereto (collectively, as the same may be amended, supplemented or otherwise modified from time to time, the "<u>DIP Loan Documents</u>") is comprised of the ability to obtain advances in an amount not to exceed $1,660,000 on terms set forth in the DIP Loan Documents; |
| Terms of DIP Note | The DIP Note calls for the accrual of simple interest at the rate of 12% per annum on the outstanding principal balance. The principal amount advanced under the DIP Note, together with any interest accrued thereon, constitute a component of the credit bid being presented by Solvay in the SH APA. All unpaid principal, together with accrued and unpaid interest thereon, shall be due and payable on the earlier of (i) April 21, 2014 (the "Maturity Date") or (ii) the date on which the (x) assets of the Company are sold to Solvay in a Disposition pursuant to the Solvay SH APA or (y) the Commitments terminate pursuant to Article 7 of the DIP Loan Agreement. |
| Priority and Liens under 364(c) or 364(d): | In order to provide the DIP Lender with security for the Debtor's repayment, reimbursement, and satisfaction of any and all of the DIP Facility Obligations, but subject to the Carve-Out (as set forth in Paragraph 18), the DIP Lender shall have, and hereby is granted liens in the Collateral (the liens described in the following subparagraphs (a) – (c), collectively, the "<u>DIP Liens</u>"), as follows: |

(a)   Pursuant to section 364(c)(2) of the Bankruptcy Code, for the sole benefit of the DIP Lender, valid, binding, continuing, enforceable, first priority and fully perfected liens in all of the Collateral that was unencumbered as of the Petition Date.

(b)   Pursuant to section 364(c)(3) of the Bankruptcy Code, for the sole benefit of the DIP Lender, valid, binding, continuing, enforceable, first priority and fully perfected liens on all of the Collateral that was encumbered as of the Petition Date, junior only to the valid, perfected and non-avoidable liens on such assets as of the commencement of the Case in favor of creditors other than the Investors and to valid liens in existence at the time of such commencement in favor of such other creditors that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (the "<u>Other Pre-Petition Liens</u>").

(c)   Pursuant to section 364(d)(1) of the Bankruptcy Code, for the sole benefit of the DIP Lender, and insofar as the priority of the liens of the Investors shall be concerned, valid, binding, continuing, enforceable, first priority and fully perfected liens on all of the Collateral that constitutes Pre-Petition Encumbered Assets.

*See*, Interim Order, ¶7.

| | |
|---|---|
| Budget and Permitted Uses: | Pursuant to the Budget. A copy of the Budget is attached as <u>Exhibit 1</u> to the Interim Order. |

*See*, Interim Order, ¶6.

---

[4] A copy of the DIP Note is attached hereto as <u>Exhibit C</u>.

Milestones that the Debtor has
agreed to observe. Failure to
observe these Milestones can
trigger an event of default
upon notice from the DIP
Lender:

| | |
|---|---|
| Petition Date | Commencement of Chapter 11 Case. |
| Petition Date | Filing of Debtor-in-Possession Financing Motion. |
| Petition Date | Filing of Section 363 Sale Motions. |
| January 21, 2014 | Obtain Interim Financing Order. |
| February 7, 2014 | Obtain Final Financing Order. |
| February 7, 2014 | Receive Approval of Stalking Horse Bid and other Bidding Procedures. |
| February 28, 2014 | Submission of any "qualified topping bids" by Acceptable Purchasers. |
| March 5, 2014 | Conduct Auction should a qualified topping bid from a least one Acceptable Purchaser be received. |
| March 7, 2014 | Approval hearing and entry of sale order. |
| March 24, 2014 | Sale Closing. |

*See*, DIP Loan Agreement, Schedule C.

Consent by Investors:    Pursuant to the terms of the Intercreditor Agreement, the Investors have consented to the priming of the Pre-Petition Liens by the DIP Liens on the terms and conditions of the Interim Financing Order and the Debtor's use of the Investors' Cash Collateral.

*See*, Interim Order, ¶ L.

Events of Default:    The DIP Loan Agreement provides the following:

An "*Event of Default*" shall mean the occurrence (whatever the reason therefor and whether voluntary, involuntary or effected by operation of law) of any one or more of the following events or conditions:

(a)    The Company fails to pay when due the principal which it is required to pay under this Agreement, any Note or any Related Agreement;

(b)    The Company fails to pay when due the interest or any other amount (other than principal) which it is required to pay under this Agreement, any Note or any Related Agreement, which failure shall continue for a period of three (3) Business Days;

(c)    Any representation or warranty made or deemed made by or on behalf of the Company in or in connection with this Agreement, any Note or any Related Agreement or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement, any Note or any Related Agreement or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect or misleading in any material respect when made or deemed made;

(d)    Except for the Chapter 11 Case, a proceeding shall have been instituted in a court having jurisdiction in the premises seeking a decree or order for relief in respect of the Company or any Subsidiary in an insolvency case under any applicable bankruptcy, insolvency, reorganization or other similar Law now or hereafter in effect, or a receiver, liquidator, assignee,

custodian, trustee, sequestrator or conservator (or similar official) of the Company or any Subsidiary for any substantial part of its property, or for the winding up or liquidation of its affairs and such proceeding shall remain undismissed or unstayed and in effect for a period of sixty (60) consecutive days or such court shall enter a decree or order granting any of the relief sought in such proceedings;

(e)     Except for the Chapter 11 Case, the Company or any Subsidiary shall admit its inability to pay its debts as they become due or shall commence a voluntary case under any applicable bankruptcy, insolvency, reorganization or other similar Law now or hereafter in effect, shall consent to the entry of an order for relief in an involuntary case under any such Law, or shall consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or conservator (or other similar official) of itself or for any substantial part of its property or shall make a general assignment for the benefit of creditors, or, taking into account the Company's and any Subsidiary's accounts payable position and present practice as to payments thereon, in each case as of the Closing Date, shall fail generally to pay its debts as they become due, or shall take any action in furtherance of any of the foregoing;

(f)     Except to the extent it is pursuant to a wind-down or liquidation plan for such Person to which Required Investors have indicated in writing that they have no objection, the liquidation or dissolution of the Company or any Subsidiary;

(g)     Except for defaults occasioned by the filing of the Chapter 11 Case and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the Company from complying or permits the Company not to comply, a default or breach occurs under any agreement, document or instrument entered into either (x) pre-petition and which is assumed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (y) post-petition, to which the Company is a party that is not cured within any applicable grace period therefor, and in either case such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the obligations of the Company the Guarantors under this Agreement, the Notes and the other Related Agreements) in excess of $50,000 in the aggregate, or (ii) causes such Indebtedness, or permits any holder of such Indebtedness or a trustee to cause such Indebtedness, to become due prior to its stated maturity or prior to its regularly scheduled dates of payment;

(h)     The Company shall default in the observance or performance of any covenant or condition set forth in the Financing Orders or any Security Document, the effect of which is to cause the Collateral Agent to lose its first-priority security interest in the Company's property as contemplated therein; or any Lien securing any obligation under this Agreement, any Note or any Related Agreement shall, in whole or in part, fail to be a perfected Lien having first priority over all other Liens;

(i)     An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(j)     The Company shall fail to perform or observe any term, covenant or agreement contained in this Agreement (other than the covenants in **Section 6.8** hereof), any Note or any Related Agreement, which failure shall continue for a period of five (5) days after any Investor or the Collateral Agent gives the Company notice of such failure;

(k)     There shall have been a failure to meet any of the Sale Milestones, which failure shall have continued for a period of two (2) days after any Investor gives the Company notice of such failure;

(l)    The Company or any other Person shall contest in any manner the validity or enforceability of any provision of this Agreement, any Note or any Related Agreement; or the Company shall deny that it has any or further liability or obligation under this Agreement, any Note or any Related Agreement, or shall purport to revoke, terminate or rescind any provision of this Agreement, any Note or any Related Agreement; or any provision of this Agreement, any Note or any Related Agreement, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all obligations of the Company hereunder or thereunder, shall cease to be in full force and effect; or any Lien securing any obligation of the Company under this Agreement, the Notes or any Related Agreement shall, in whole or in part, fail to be a perfected Lien having the priority purported to be created by the Financing Orders;

(m)    Any event or condition occurs that results in any Indebtedness (other than Pre-Petition Indebtedness) of the Company or any Subsidiary becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (in the case of any Indebtedness constituting a Guarantee) to become payable;

(n)    More than one-third of the Current Key Employees shall have departed the Company or have otherwise ceased working for the Company prior to a Disposition;

(o)    The Bankruptcy Court shall enter an order with respect to Company dismissing its Chapter 11 Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee in its Chapter 11 Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Company's business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), and the order appointing such trustee, responsible officer or examiner shall not be stayed, reversed or vacated within five (5) days after the entry thereof;

(p)    The Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder of any claim against any of the Company having an aggregate value (for all such claims) in excess of $50,000, which order enables the holder of such claim to exercise any right or remedy against any property of the Company;

(q)    An order of the Bankruptcy Court shall be entered in the Chapter 11 Case amending, supplementing, staying for a period in excess of five (5) days, vacating or otherwise modifying any of the Financing Orders (including entry of an order terminating the use of cash collateral (as more fully described in the definition of the term "Interim Financing Order")), or the Company shall apply for authority to do so; provided that no Event of Default shall occur under this **Section 7.1(q)** to the extent that any such amendment, supplement or other modification is made in compliance with this Agreement and is not adverse, in the reasonable judgment of Solvay, to the rights and interests of the Investors under this Agreement, the Notes and the other Related Agreements;

(r)    The Company shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Company) any other Person's opposition of, any motion made in the Bankruptcy Court by any Investor seeking confirmation of the amount of such Investor's claim or the validity and enforceability of the Liens in favor of such Investor (including the Liens securing Pre-Petition Indebtedness owed to such Investor);

(s)    From and after the date of entry thereof, the Interim Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of five (5) days, reversed, modified or amended), in each case without the consent of the Required Investors, and the Final Financing Order shall not have been entered prior to such cessation (or vacatur, stay, reversal, modification or amendment);

(t)    The Final Financing Order shall not have been entered by the Bankruptcy Court on or before February 7, 2014; or from and after the date of entry thereof, the Final Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of five (5) days, reversed, modified or amended), in each case without the consent of the Required Investors;

(u)    The Company shall make any payment on any Indebtedness of the Company incurred before the Petition Date, other than as permitted under the Financing Orders or as permitted hereunder and other than any payment approved by the Bankruptcy Court of any Indebtedness;

(v)    The Company shall fail to comply with the terms of the Financing Orders;

(w)    Final judgments which exceed an aggregate post-Petition Date liability of $50,000 shall be entered against the Company and shall not have been paid, discharged or vacated or had execution thereof stayed pending appeal within thirty days after entry or filing of such judgments; or there shall be entered against the Company a non-monetary judgment, order or decree with respect to any claim or liability that accrued after the Petition Date which has or could be reasonably expected to have a Material Adverse Effect, and there shall be any period of thirty consecutive days during which a stay of enforcement of such judgment, decree or order, by reason of a pending appeal or otherwise, shall not be in effect;

(x)    The commencement of any action against the Collateral Agent or any Investor by or on behalf of the Company or any of its Affiliates, officers or Employees;

(y)    The allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against any or all of the Collateral Agent and the Investors (including with respect to the Pre-Petition Purchase Agreement) and the Collateral or the "Collateral" (as defined in the Pre-Petition Purchase Agreement);

(z)    The Company enters into or purports to enter into an agreement pursuant to which the Company would sell all or substantially all of its assets other than pursuant to the Proposed Section 363 Sale based on an asset purchase agreement in form and substance satisfactory to the Investors and approved by a sale order in form and substance to which the Required Investors have not objected;

(aa)   The Bidding Procedures Order shall not have been entered on or before February 7, 2014, or, if so entered prior such date, the Company seeks to modify, amend, or vacate the Sales Procedure Order or the Sales Procedure Order is otherwise modified, amended, or vacated, in each instance, in a manner that is not acceptable to Solvay;

(bb)   Either party terminates or purports to terminate the SH APA;

(cc)   The Proposed Section 363 Sale is not approved by the Bankruptcy Court on or before March 7, 2014, or the Proposed Section 363 Sale is not consummated on or before March 20, 2014;

(dd)   The entry of an order granting any other claim superpriority status or a Lien equal or superior to that granted to the Collateral Agent for the benefit of the Investors, other than with respect to the Carve-Out;

(ee)   The entry of an order authorizing recovery by any Person from the Collateral or any collateral securing the Pre-Petition Indebtedness owing to

any Investor or any adequate protection Liens granted with respect thereto for any costs of preservation or Disposition thereof under Section 506(c) of the Bankruptcy Code or (except as provided in the Final Financing Order) authorizing the use of cash collateral without consent in writing by Solvay;

(ff)     The filing by the Company of any motion or proceeding which could reasonably be expected to result in material impairment of the Investors' rights under this Agreement, the Notes or any Related Agreement; or a final determination by the Bankruptcy Court (or any other court of competent jurisdiction) with respect to any motion or proceeding brought by any other party which results in any material impairment of the Investors' rights under this Agreement, the Notes or any Related Agreement;

(gg)     The entry, without Solvay's consent, of an order by the Bankruptcy Court extending any exclusive right that the Company may have to (i) propose any plan of reorganization in the Chapter 11 Case to a date more than one hundred and twenty (120) days after the Petition Date or (ii) solicit votes for or seek the confirmation of any plan of reorganization in the Chapter 11 Case to a date more than one hundred and eighty (180) days after the Petition Date; or

(hh)     The Company, directly or indirectly, files, supports, or seeks confirmation of any Contested Plan.

*See*, DIP Loan Agreement, Article 7.

| | |
|---|---|
| DIP Loan Agreement Events of Default and Automatic Relief from Stay: | Upon the occurrence and continuance of any Event of Default as set forth in Section 7.1 of the DIP Loan Agreement or the Debtor's violation of any provision of this Interim Financing Order or the Final Financing Order, and in addition to the right of the DIP Lender to refuse to make further loans pursuant to the provisions of the DIP Loan Documents, the automatic stay under section 362 of the Bankruptcy Code shall be deemed lifted, without further order of or application to the Bankruptcy Court, to permit the DIP Lender to do one or more of the following:  (a) terminate the Debtor's use of Cash Collateral and cease to make any loans or advances to the Debtor; (b) declare all DIP Facility Obligations to be immediately due and payable; (c) terminate any unfunded commitments under the proposed DIP Facility; (d) set off and apply immediately any and all amounts in accounts maintained by the Debtor with the DIP Lender against the DIP Facility Obligations, and otherwise enforce rights against the Collateral in the possession of any of the Collateral Agent and/or the DIP Lender for application towards the DIP Facility Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Financing Order, the other DIP Loan Documents, or applicable law to effect the repayment and satisfaction of the DIP Facility Obligations; <u>provided</u>, that the DIP Lender shall provide three (3) business days written notice (by facsimile, telecopy, electronic mail, or otherwise) to the U.S. Trustee, counsel to the Debtor and counsel to any committee appointed in this Case prior to exercising any enforcement rights or remedies in respect of the Collateral (other than the rights described in clauses (a), (b) and (c) above to the extent they might be deemed remedies in respect of the Collateral); <u>provided further</u>, that the Debtor shall have the right to seek continuation of the automatic stay during such three (3) business day period solely on the basis that no Event of Default has occurred. |

*See*, Interim Order, ¶ 19.

| | |
|---|---|
| Cash Collateral Events of Default and Automatic Relief | Upon the occurrence and continuance of any Event of Default as set forth in Section 7.1 of the DIP Loan Agreement or the Debtor's violation of any |

| | |
|---|---|
| from Stay: | provision of this Interim Financing Order or the Final Financing Order, and in addition to the right of the DIP Lender to refuse to make further loans pursuant to the provisions of the DIP Loan Documents, the automatic stay under section 362 of the Bankruptcy Code shall be deemed lifted, without further order of or application to the Bankruptcy Court, to permit the DIP Lender to do one or more of the following: (a) terminate the Debtor's use of Cash Collateral and cease to make any loans or advances to the Debtor; (b) declare all DIP Facility Obligations to be immediately due and payable; (c) terminate any unfunded commitments under the proposed DIP Facility; (d) set off and apply immediately any and all amounts in accounts maintained by the Debtor with the DIP Lender against the DIP Facility Obligations, and otherwise enforce rights against the Collateral in the possession of any of the Collateral Agent and/or the DIP Lender for application towards the DIP Facility Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Financing Order, the other DIP Loan Documents, or applicable law to effect the repayment and satisfaction of the DIP Facility Obligations; provided, that the DIP Lender shall provide three (3) business days written notice (by facsimile, telecopy, electronic mail, or otherwise) to the U.S. Trustee, counsel to the Debtor and counsel to any committee appointed in this Case prior to exercising any enforcement rights or remedies in respect of the Collateral (other than the rights described in clauses (a), (b) and (c) above to the extent they might be deemed remedies in respect of the Collateral); provided further, that the Debtor shall have the right to seek continuation of the automatic stay during such three (3) business day period solely on the basis that no Event of Default has occurred. |

*See*, Interim Order, ¶ 20.

| | |
|---|---|
| Indemnification of any party: | The Company shall indemnify the Collateral Agent (and any sub-agent thereof), each Investor and each Related Party of each of the foregoing Persons (each such Person being called an "*Indemnitee*") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including, without limitation, the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including, without limitation, the Company) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the Notes, the Related Agreements or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any advance under any Note or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Company, or any Environmental Loss related in any way to the Company or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Company, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee; provided that until the Final Financing Order has been entered by the Bankruptcy Court, the indemnification obligations of the Company hereunder shall be limited to those indemnified liabilities arising from or relating to the |

funding authorized by the Interim Financing Order.

*See*, DIP Loan Agreement, Article 9.4(b).

| | |
|---|---|
| Modification of the Debtor's authority or right to file a plan, seek an extension of time in which the Debtor has the exclusive right to file a plan. | Without the consent of the DIP Lender, under no circumstances shall any Chapter 11 plan in this Case be confirmed or become effective unless such plan provides that the DIP Facility Obligations shall be paid in full in cash and satisfied in the manner provided in the DIP Loan Documents on or before the effective date of such plan. |

*See*, Interim Order, ¶ 21(b).

| | |
|---|---|
| Local Rule 4001-2(a)(i)(A): Provisions that grant cross-collateralization protection to the prepetition secured creditors. | None. |

| | |
|---|---|
| Local Rule 4001-2(a)(i)(B): Provisions or findings of fact that bind the estate with respect to validity, perfection or amount of the secured creditor's prepetition lien or waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters. | In the Interim DIP Order, the Debtor acknowledges, admits and confirms that: |

The Prepetition Note Agreements, by and among the Debtor and the Investors, provided for loans and other financial accommodations to the Debtor;

The September 2013 Note Agreement was intended to provide financing to bridge to a sale of substantially all of the assets of, or equity interests in, the Debtor. In addition, the September 2013 Note Agreement expressly provided, in the event that such a disposition was not able to be accomplished outside of a bankruptcy proceeding, a commitment by Solvay America, Inc. ("Solvay"), referred to as the Tranche C Commitment, to provide debtor-in-possession financing upon the satisfaction of certain terms and conditions to finance the sale of substantially all of the Debtor's assets under sections 363 and 365 of the Bankruptcy Code in a subsequent Chapter 11 case to be commenced by the Debtor;

The Prior Obligations are not subject to disallowance, subordination, re-characterization, defense, counterclaim, cross-claim, deduction or offset of any kind or otherwise avoidable, and as of the Petition Date, the Debtor was liable to the Investors in respect of loans made by the Investors pursuant to the Pre-Petition Note Agreements in the aggregate amount of not less than $30,155,000, consisting of:    (i) the aggregate principal amount; and (ii) accrued and unpaid interest thereon at the applicable rate as well as attorneys' fees, costs and other expenses;

The Prior Obligations are secured by valid, perfected, enforceable liens and security interests (collectively, the "Pre-Petition Liens") granted by the Debtor to the Investors, which liens and security interests are not subject to subordination, defense, disallowance or otherwise avoidable, upon substantially all of the Debtor's assets (the "Pre-Petition Encumbered Assets");
    (a)   The Debtor and others entered into that certain Third Amended and Restated Intercreditor Agreement, dated as of September 20, 2013 (the "Intercreditor Agreement"), by and among the Debtor, Solvay, and certain other Investors including, without limitation, SVIC No. 20 New Technology Business Investment L.L.P., and UDC, Inc;

(b)  By virtue of the provisions of the Intercreditor Agreement and applicable law, that portion of the Prior Obligations incurred or deemed by the Debtor pursuant to the September 2013 Note Agreement are secured by first-priority liens and security interests (the "September 2013 Liens");

The Pre-Petition Loan Documents are valid and binding agreements and obligations of the Debtor, and the Pre-Petition Liens on the Pre-Petition Encumbered Assets:  (i) constitute valid, binding, enforceable and perfected security interests and liens, and the September 2013 Liens, by virtue of the Intercreditor Agreement and applicable law, constitute valid, binding, enforceable and perfected first priority security interests and liens; and (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination by the Debtor pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

The Prior Obligations constitute legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms; (ii) the Debtor has no objection, offset, defense or counterclaim of any kind or nature to the Prior Obligations; and (iii) the Prior Obligations, and any amounts previously paid to any Investor on account thereof or with respect thereto, are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

Solvay, as the collateral agent (on its behalf and on behalf of the Investors) under the September 2013 Note Agreement and the Intercreditor Agreement (the "Collateral Agent"), perfected the September 2013 Liens in and on the Pre-Petition Encumbered Assets;

For purposes of sections 506(c) and 507(b) of the Bankruptcy Code and Bankruptcy Rule 3012, as of the Petition Date and by virtue of the stated purchase price of the Stalking Horse Bid (as such term is defined below), the value of the Investors' interest in the Pre-Petition Encumbered Assets was not less than $30,155,000; provided, however, that nothing herein shall prejudice the Investors' right to later:  (1) assert that their respective interests in the Pre-Petition Encumbered Assets lack adequate protection; or (2) seek a different valuation of the Pre-Petition Encumbered Assets, it being understood, that the Collateral Agent asserts that value of the Pre-Petition Encumbered Assets will be deemed to have been higher, on a dollar-for-dollar basis, by an amount equal to the amount, if any, by which the amount ultimately recovered by virtue of the Sale Process (as such term is defined herein) exceeds the amount that would have been received under the Stalking Horse Bid (as such bid was constituted on the Petition Date).

*See*, Interim Order, ¶ D.

| | |
|---|---|
| Local Rule 4001-2(a)(i)(C): Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c). | None. |
| Local Rule 4001-2(a)(i)(D): Provisions that immediately grant to the prepetition secured | Causes of action arising under sections 544, 545, 547, 548, 549, 550, 553(b) and 724(a) (the "Bankruptcy Actions") are specifically excluded from the Collateral solely for purposes of the Interim Order. |

| | |
|---|---|
| creditor liens on certain claims and causes of action. | However, the Final Financing Order requested to be entered at the Final Hearing is contemplated to contain provisions expressly including the Bankruptcy Actions as part of the Collateral.<br><br>*See*, Interim Order, ¶ 7. |
| Local Rule 4001-2(a)(i)(E): Provisions that deem prepetition secured debt to be postpetition secured debt or that use postpetition loans for a prepetition secured creditor to pay part or all of that secured creditor's prepetition debtor, other than as provided in 11 U.S.C. § 552(b). | None. |
| Local Rule 4001-2(a)(i)(F): Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. | The Interim Order contains the Carve-Out provision. The Budget contains a separate line item for the payment of professional fees and expenses of the Debtor's bankruptcy counsel and Committee Counsel. The Budget line item for the Debtor's bankruptcy counsel is in excess of that of the Committee Counsel.<br><br>*See*, Interim Order , ¶ 18. |
| Local Rule 4001-2(a)(i)(G): Provisions that prime any secured lien without the consent of that lienor. | One secured creditor did not execute the Third Amended and Restated Intercreditor Agreement. However, the amendment provisions of the prior iteration of said intercreditor agreement permitted it to be amended and restated by a requisite percentage (but fewer than all) of the applicable secured creditors, which percentage was satisfied in connection with the execution and delivery of said Third Amended and Restated Intercreditor Agreement. |
| Local Rule 4001-2(a)(i)(H): Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552 (b)(1). | None. |

## APPLICABLE AUTHORITY

### A.    The DIP Facility Should be Approved

32.     Section 364(c) of the Bankruptcy Code provides that if a debtor-in-possession is

unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1)

of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize the debtor-in-

possession to obtain credit or incur debt:

> a.   with priority over any and all administrative expenses of the kind specified in
>      section 503(b) or 507(b) of [the Bankruptcy Code]; or
>
> b.   secured by a lien on property of the estate that is not otherwise subject to a
>      lien; or
>
> c.   secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

33.     Pursuant to section 364(d) of the Bankruptcy Code, a debtor-in-possession may

also grant liens and security interests in all or a part of its assets that are prior and superior to all

other liens or security interests therein.

34.     Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to

obtain post-petition financing and provides in relevant part:

* * *

> (2) <u>Hearing</u>.  The Court may commence a final hearing on a motion for
> authority to obtain credit no earlier than 14 days after service of the
> motion.  If the motion so requests, the court may conduct a hearing
> before such 14 day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate and
> irreparable harm to the estate pending a final hearing.

Bankruptcy Rule 4001(c).  Accordingly, the Court is authorized to grant the relief

requested herein.

35.     Courts have articulated a three-part test to determine whether a debtor may obtain

financing under §364(c) of the Code: (i) the debtor is unable to obtain unsecured credit under

Section 364(b) (i.e., by granting a lender administrative expense priority); (ii) the credit

transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction

are fair, reasonable and adequate, given the circumstances of the debtor and the proposed lender.

*In re Aqua Associates,* 123 B.R. 192, 195-96 (Bankr. E.D. Pat 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit required is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere."); *In re Ames Department Stores, Inc.,* 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (holding that financing will not be approved where "it is apparent that the purpose of the financing is to benefit a creditor rather than the estate" and that the debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code). Here, the Debtor has been unable to obtain unsecured credit (or any additional secured credit), and entering into the DIP Facility is necessary to preserve the Debtor's assets; and the Debtor believes that the terms of the DIP Facility are fair, reasonable and adequate.

36.    Pursuant to Section 364(d)(l) of the Code, a debtor can also obtain financing on a superpriority basis over other secured creditors. In order to obtain superpriority financing, the debtor must show that the interest of the holder of the lien on the property on which the senior priority lien is proposed to be granted is adequately protected. *In re Swedeland Development Group, Inc.,* 16 F.3d 552, 564 (3d Cir. 1994). The Bankruptcy Code does not expressly define adequate protection, but Section 361 provides that adequate protection can be provided by periodic cash payments, additional replacement liens, or other relief resulting in the "indubitable equivalent" of the secured creditor's interest in such property. *Swedeland,* 16 F.3d at 564. "Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan." *Id.*

37.    The Debtor believes that the best means to maximize the value of the Debtor's assets is to promptly conduct an auction sale.  The Debtor, however, lacks sufficient funds to operate its business and meet its post-petition obligations pending a sale of its assets before this Court.  Prior to the Petition Date and in connection with the negotiation of the Senior Secured Credit, the Debtor requested that the Senior Noteholders provide post-petition financing to enable the Debtor to continue to operate in the ordinary course through the closing of an auction sale.  Following arms-length negotiations, Solvay is providing post-petition financing, and pursuant to the Intercreditor Agreement, the Secured Creditors have consented to the priming of their liens and the use of their cash collateral in connection therewith to enable the Debtor to operate through the closing of an auction sale.

38.    The Debtor has virtually no unencumbered funds or credit available to fund its business operations.  Without funding under the debtor-in-possession financing facility from Solvay and the use of cash collateral, as proposed herein, the Debtor's operations will have to immediately cease, the value of its assets will be severely diminished, and many jobs will be lost.  Further, due to severe operating and financial difficulties, the Debtor has been unsuccessful in its attempts to secure funding outside of a chapter 11 context nor could the Debtor secure funding inside of a chapter 11 bankruptcy on an unsecured or subordinated basis.  In short, without the use of cash collateral and funding under the proposed debtor-in-possession financing facility, the Debtor's prospects for maximizing the going concern value through a sale of substantially all of its assets will be substantially undermined and the value of the Debtor's assets will be placed in serious jeopardy.  Therefore, it is imperative that the Debtor be authorized to use cash collateral and obtain debtor-in-possession financing in order to preserve its assets pending the conduct of an action sale before this Court.

39.     To protect and preserve the Debtor's assets pending conclusion of a sale process, Solvay is prepared to waive the existing defaults and proceed with its commitment under the DIP Facility. The DIP Facility contemplates that the Debtor will first use available cash collateral to satisfy obligations, and then use proceeds from the DIP Facility.

40.     The Debtor believes that advances under the DIP Facility coupled with use of cash collateral will be sufficient to enable the Debtor to continue to operate on a going concern basis for approximately sixty (60) days after the Petition Date, an amount of time sufficient to allow them to complete an orderly sale process, plus another approximate thirty (30) days to conduct a post-sale wind-down.

41.     The DIP Facility was negotiated at arms' length and in good faith, and its terms and conditions are reasonable under the circumstances.

42.     Inasmuch as the terms and conditions of the Post-Petition Financing are fair and reasonable, and were negotiated by the parties in good faith and at arms' length, the DIP Lender should be accorded the benefits of §364(e) of the Bankruptcy Code.

43.     Based on the above, the Debtor decided, in the exercise of its sound business judgment, that the DIP Facility (together with the use of cash collateral) was the most favorable under the circumstances and addressed the Debtor's working capital needs. It, along with the use of cash collateral, will afford the Debtor valuable additional time to pursue the sale process while maintaining the going concern value of the Debtor's business.

44.     In addition, the Investors, pursuant to the Intercreditor Agreement, are deemed to have agreed to allow their prepetition liens to be primed and the Debtor to use cash collateral upon the conditions set forth in this Motion and in the proposed Interim Order and Final Order. The Debtor requires immediate access to funds in order to pay essential expense items. The

{P0329457.1 }

Debtor also requires certain funds to pay any unforeseen costs and expenses pending a final hearing on this Motion.

### The Automatic Stay Should Be Modified on a Limited Basis

45.     The relief requested in this Motion contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to: (a) permit the Debtor to grant the security interests, liens, and superpriority claims described above with respect to the DIP and to perform such acts as may be reasonably requested to assure the perfection and priority of such security interests and liens; (b) permit the DIP Lender to exercise (solely with respect to the DIP Facility), upon the occurrence and continuance of an Event of Default, the rights and remedies provided for in the DIP Facility, the Interim Order, and the Final Order, as applicable; and (c) implement the terms of the DIP Orders.

46.     In the Debtor's business judgment, the stay modification requested in this Motion (and provided for in the Interim Order) is fair and reasonable under the circumstances.

### The Debtor should be Permitted to Make Interim
### Borrowings Under the DIP Facility

47.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on such a motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a hearing to consider the relief requested on a final basis.

48.     Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtor respectfully requests that the Court conduct an expedited preliminary hearing on this Motion and (i) authorize the Debtor to use Cash Collateral and, consistent with the Budget and the DIP Facility, use the

proceeds of the DIP Facility on an interim basis, pending the Final Hearing and entry of the Final Order, to avoid immediate and irreparable harm to the Debtor's estate and (ii) schedule the Final Hearing.

49.     The Debtor requires the ability to obtain immediate credit under the DIP Facility on an interim basis pending the Final Hearing in an amount of up to $642,319.

50.     Such credit is needed to satisfy the Debtor's obligations in connection with the operation of its business, including, but not limited to, the payment of employee wages, salaries and benefits, as well as the Debtor's rent obligation. The immediate and irreparable harm that could result in the absence of approval of interim financing is detrimental to the interests of all concerned.

## SATISFACTION OF BANKRUPTCY RULE 6003

51.     Pursuant to Bankruptcy Rule 6003, the Bankruptcy Court may grant a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within twenty one (21) days after the Petition Date to the extent the relief is necessary to avoid immediate and irreparable harm. Fed. R. Bankr. P. 6003. As set forth above and in the Snyder Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estates and, therefore, entry of the Interim Order is appropriate under Bankruptcy Rule 6003.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

52.     For the reasons set forth herein, to implement the foregoing immediately, the Debtor requests that the Bankruptcy Court waive the notice requirements under Bankruptcy Rule

6004(a), if applicable, and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

53.     The Debtor shall provide notice of this Motion by facsimile, email and/or overnight mail to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtor's twenty (20) largest unsecured creditors; (iii) the Investors (and their counsel where applicable); (iv) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (vi) applicable state regulatory authorities.  In light of the nature of the relief requested in this Motion, the Debtor respectfully submits that no further notice is necessary.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.


[REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter the Interim Order, attached hereto, schedule the Final Hearing and thereafter enter the Final Order, and (ii) grant such other and further relief as is just and proper.

CAMPBELL LEVINE, LLC

Dated: January 17, 2014
      Wilmington, Delaware

By: */s/ Mark T. Hurford*
Mark T. Hurford (DE No. 3299)
Ayesha C. Bennett (DE No. 4994)
222 Delaware Avenue, Suite 1620
Wilmington, DE 19801
(302) 426-1900
(302) 426-9947 (facsimile)
mhurford@camlev.com
abennett@camlev.com

and

Stanley E. Levine, Esquire
Paul J. Cordaro, Esquire
1700 Grant Building
Pittsburgh, PA 15219
(412) 261-0310
(412) 261-5066 (facsimile)
slevine@camlev.com
pcordaro@camlev.com

*Proposed Counsel for the Debtor and Debtor-in-Possession*